RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0328p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re: GLOBAL TECHNOVATIONS
INCORPORATED; ONKYO AMERICA
INCORPORATED,

                                    *Debtors*.

_____

ONKYO EUROPE ELECTRONICS GMBH;
ONKYO MALAYSIA SDN BHD; ONKYO
CORPORATION,

                                    *Appellants*,

        *v*.

GLOBAL TECHNOVATIONS INCORPORATED,
                                    *Appellee*.

No. 11-1582

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-12781—Marianne O. Battani, District Judge.

Argued: May 31, 2012

Decided and Filed: September 13, 2012

Before: BOGGS, NORRIS, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael R. Limrick, BINGHAM McHALE LLP, Indianapolis, Indiana, for Appellants. Glenn M. Kurtz, WHITE & CASE LLP, New York, New York, for Appellee. Jeffrey A. Clair, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae **ON BRIEF:** Michael R. Limrick, John F. McCauley, BINGHAM McHALE LLP, Indianapolis, Indiana, for Appellants. Glenn M. Kurtz, WHITE & CASE LLP, New York, New York, Charles C. Kline, Jason R. Domark, WHITE & CASE LLP, Miami, Florida, for Appellee. Sarang V. Damle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

1

———————————

**OPINION**

———————————

BOGGS, Circuit Judge.   Global Technovations Incorporated ("GTI") went bankrupt after it purchased Onkyo America Incorporated ("OAI"), a subsidiary of Onkyo Corporation ("Onkyo").  GTI had purchased OAI for $13 million in cash and $12 million in three-year promissory notes.   Onkyo attempted to recover the remainder of the purchase price from GTI's bankruptcy estate by filing a proof of claim for $12 million. GTI responded by suing Onkyo under the theory that the OAI purchase was a fraudulent, voidable transaction. The bankruptcy court agreed.  The court found that OAI was worth $6.9 million at the time of the transaction, not $25 million.  As a result, the court voided GTI's obligation to pay the remainder of the purchase price.   It also ordered Onkyo to repay GTI $6.1 million—the difference between the $13 million GTI had paid and the $6.9 million the bankruptcy court determined that OAI was worth.

The United States District Court for the Eastern District of Michigan affirmed the bankruptcy court's decision.  After wrestling with a debate about the extent of the bankruptcy court's jurisdiction to order relief, we also affirm.

**I**

**A**

OAI, an Indiana-based supplier of car-stereo equipment, was a subsidiary of Onkyo and two of its other subsidiaries, Onkyo Europe and Onkyo Malaysia.  In the late 1990's, Onkyo began trying to sell OAI.  Onkyo's chairman and CEO,  Naoto Otsuki, wanted to take Onkyo public and selling OAI would allow Onkyo to realize a gain, which in turn would allow it to utilize a tax-loss carryforward languishing on its books.

Onkyo management approached GTI about buying OAI because the companies had done business before.   Onkyo told GTI that OAI had strong cash flows and generated approximately $6.9 million in revenue per year.

GTI needed cash—its primary investor no longer wanted to invest with the company and it was not generating sufficient revenue. GTI was in danger of being delisted by the American Stock Exchange, a consequence it wished to avoid. Therefore, GTI expressed interest when Onkyo approached it about purchasing OAI.

Because OAI was a private company and no public information was available, GTI relied on the assertions made by Onkyo management, specifically, president Shinobu Shimojima and CFO Doug Pillow, during negotiations and due diligence. GTI relied on OAI's projection that as of August 31, 2000, the month of the sale, OAI's trailing-12-month earnings before interest, taxes, depreciation and amortization (EBITDA) would be $6.8 million. However, as time passed, the numbers actually earned came in below what OAI had projected. As a result, the price of the acquisition was lowered and it was difficult for the parties to secure financing.

Once financing was secured, third-party due diligence was performed by Deloitte & Touche. Deloitte & Touche reported that it believed OAI would remain solvent, but it conditioned this conclusion on the accuracy and completeness of the information given by OAI's management, stating that it had taken no independent steps to verify the information provided by OAI's management. Deloitte & Touche also evaluated cost-saving measures touted to GTI by OAI; however, Deloitte & Touche did not analyze the feasibility of these measures—they "assumed the proposed cost saving measures were viable, and confirmed the mathematical accuracy of the projected impact of the cost savings on OAI's financial statements."

On August 23, 2000, Onkyo and GTI executed an amended Share Purchase Agreement, a contract for sale. In exchange for all 569,000 shares of OAI's common stock, which was owned by Onkyo Europe, Onkyo Malaysia, and Onkyo Japan, GTI agreed to pay $13 million in cash and to provide a $12 million obligation, payable in August 2003. The obligation took the form of three promissory notes—one to Onkyo Europe, one to Onkyo Malaysia, and one to Onkyo Japan, each in proportion to their ownership of OAI.

After the purchase, GTI made several unpleasant discoveries about OAI's financial health.  First, accounting errors and adjustments reduced OAI's trailing-12-month EBITDA figure by 29%.  Of the $1.3 million OAI's management projected would be earned in July and August, only $475,000 was actually achieved.  The court agreed with GTI's expert witness that "the existence and severity of this miss [in earnings] would have become apparent to OAI's management in the course of their day-to-day liquidity analysis . . . [and] establishes that the Onkyo Defendants either knew or should have known about this significant and material performance miss before the closing of the acquisition.  But they failed to disclose the anticipated miss to GTI."  Another error was a roughly $650,000 double counting of inventory.  Pillow, OAI's CFO, knew about the double counting, but he chose not to disclose it to GTI.

Second, GTI discovered that the cost-saving measures projected by OAI's management—$2.7 million annually—were dramatically overstated.  Neither OAI management nor Deloitte & Touche analyzed the feasibility of these measures to ascertain their true value.  After the acquisition, it became apparent that most of the savings were based on projections from measures that were not viable.

Third, OAI's sales forecasts were not met.  For example, OAI had projected a $5.1 million increase in sales revenues for 2000, even though it had not met its prior, lower, sales goals.  An OAI sales manager had written to the OAI's president to inform him that the sales forecasts were "unreasonable and unattainable."  The increase in sales failed to materialize.

Finally, GTI discovered that OAI's management had undisclosed conflicts of interest during the acquisition.  Pillow, OAI's CFO, was offered a one-time payment of $100,000 by Onkyo's management, if and only if OAI was sold to GTI.  Pillow was paid $100,000 after the acquisition.  Also undisclosed was the fact that OAI's president, Shimojima, owned 300,000 shares of stock in Onkyo, and stood to benefit if Onkyo improved its books and went public.  Shimojima was also an active member of Onkyo's board of directors.

Sixteen months after the acquisition, on December 18, 2001, GTI filed a voluntary petition for bankruptcy under Chapter 11. The next day, OAI, now wholly owned by GTI, did the same.

An entity's act of filing a petition for bankruptcy operates as a "stay" of actions that could have been filed against the entity to recover claims. 11 U.S.C.A. § 362(a). Similarly, once a petition is filed, judgments cannot be enforced against the debtor, the debtor's property cannot be repossessed or foreclosed on, and liens cannot be perfected or enforced against the debtor's property. *Ibid.* Therefore, once GTI filed for bankruptcy, Onkyo was unable to recover the $12 million obligation that GTI still owed for OAI.

However, Onkyo petitioned the bankruptcy court to allow it to recover the $12 million. Onkyo filed proofs of claim in the bankruptcy court, requesting that the court lift the stay. A bankruptcy court can lift the stay for cause, after notice and a hearing, if a party requests. 11 U.S.C.A. § 362(d)(1).

GTI then filed the instant suit in the bankruptcy court.

**B**

*1. The Bankruptcy Court Proceeding*

On July 14, 2010, GTI filed a suit in bankruptcy court. GTI sought to avoid the $12 million obligation that it incurred and recover the $13 million payment it made to Onkyo when it purchased OAI, on the basis that the sale was a fraudulent transfer. Second, and relatedly, GTI asked that the bankruptcy court disallow the proofs of claim that Onkyo filed in the bankruptcy court, as they were based on the allegedly fraudulent transfer.

Chapter 11 allows a bankruptcy trustee to avoid any transfer (excepting certain charitable contributions) participated in by the debtor that is "voidable under applicable law by a creditor holding an unsecured claim that is allowable under [11 U.S.C.] § 502." 11 U.S.C. § 544(b)(2). Therefore, a trustee can avoid a transfer if a hypothetical

unsecured creditor of the debtor could void it under an applicable law.  GTI claimed that an unsecured creditor could void both its payment of $13 million and its obligation of $12 million under the Florida Uniform Fraudulent Transfer Act, FLA. STAT. § 726.101 et seq.  The Florida Uniform Fraudulent Transfer Act was "applicable law" under the bankruptcy code because GTI had its principal place of business in Florida.[1]

> The Florida Uniform Fraudulent Transfer Act provides, in relevant part:
>
> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

FLA. STAT. § 726.106(1).  To prove that the obligation incurred by GTI to Onkyo was the result of a fraudulent transfer, then, the bankruptcy court required GTI to prove three elements:

> 1) That an actual creditor existed whose claim arose before the transfer was made and the obligation was incurred,
>
> 2) that GTI received less than reasonably equivalent value in exchange for the transfer and obligations,[2] and
>
> 3) that GTI was insolvent at the time, or became insolvent as a result of, the transfer and obligations.

The bankruptcy court conducted an 17-day bench trial to determine whether Onkyo's sale of OAI for $25 million was a fraudulent transfer.  GTI presented extensive testimony from its officers and from its expert, Van Conway.  Onkyo countered with extensive cross-examination and proffered its own expert, Jeffrey Risius.

---

[1] A corporation is "deemed to be a citizen . . . of the State or foreign state where it has its principal place of business . . . ."  28 U.S.C. § 1332(c)(1).

[2] Under Florida law, as well as the law of the Fifth and Eleventh Circuit, if the debtor has received 70% or less of the value it gave in the transfer, then it has not, as a general rule, received "reasonably equivalent" value. *See Bakst v. Levenson (In re Goldberg)*, 229 B.R. 877, 884–85 (Bankr. S.D. Fla. 1998) (collecting cases).

On June 30, 2010, the court filed its trial opinion.  The trial court made the following key findings:

- OAI was worth $6.9 million at the time of the transfer.[3]

- GTI paid $21.6 million in value for OAI.  This value was the sum of the $13 million in cash GTI paid and the $8.6 million value that the court determined to be the present discounted value of the $12 million in promissory notes.  Risius, Onkyo's expert, put a present discounted value on the notes of $8.6 million; Conway, GTI's expert, stated that the present discounted value should be the same as the face value—$12 million.  The court credited the value of Onkyo's expert, Risius.

- The value of the indirect benefits Onkyo argued GTI received in the transaction was zero.

Based on these findings, the bankruptcy court determined that GTI had not received reasonably equivalent value when it purchased OAI because the $6.9 million in value GTI received was well under 70% of the $21.6 million given up ($13 million in cash augmented by the $8.6 million the court determined the promissory notes were worth).  The court ordered that GTI's obligation to pay the $12 million in promissory notes be avoided, and ordered that Onkyo repay GTI $6.1 million—the difference between the $13 million in cash Onkyo had received and the $6.9 million the court determined OAI had been worth.

Onkyo appealed the judgment to the United States District Court for the Eastern District of Michigan.  The district court had jurisdiction under 28 U.S.C. § 158(a).

*2. The District Court Proceeding*

The appellants pursued two lines of attack : Onkyo argued first, that GTI did in fact receive equivalent value when it purchased OAI for $25 million, and second, that GTI failed to prove that it was rendered insolvent due to the transaction.

---

[3]This value was the highest of three possible values (resulting from three different methods of valuation) offered by Conway, GTI's expert.

To show that GTI received reasonably equivalent value when it purchased OAI, Onkyo argued that the bankruptcy court overestimated how much value GTI paid. Specifically, it argued that the bankruptcy court incorrectly used Onkyo's expert's estimate for the face value of GTI's $12 million in promissory notes. It argued that using their expert's number was impermissible because the bankruptcy court did not also credit his testimony that the transaction did not make GTI insolvent. The appellants argued that the "conclusion about what GTI paid out depends entirely on Risius' [sic] other conclusion—which the court flatly rejected—that GTI remained solvent after the transaction." Further, Onkyo argued that GTI failed to put forth its own evidence regarding the value of the notes.

To show that GTI received reasonably equivalent value in the transaction, Onkyo also argued that the bankruptcy court underestimated the amount of value GTI received. It claimed the "indirect benefits" that GTI received, which the bankruptcy court had decided were worth "less than zero," were actually worth more. Onkyo also argued that the bankruptcy court used hindsight in valuing the indirect benefits and that this made its valuation wrong as a matter of law. Finally, Onkyo argued that the bankruptcy court should have rejected GTI's expert testimony about the indirect benefits' value.

For their second line of attack, Onkyo argued that GTI failed to prove that it was rendered insolvent as a result of purchasing OAI. Specifically, it argued that the bankruptcy court erred when it admitted GTI's expert's testimony on the matter. Though Onkyo's brief suggests that the bankruptcy court erred when it did not credit its expert's opinion that GTI was not insolvent at the time it bought OAI, Onkyo only raises this argument in regard to proving the valuation of GTI's promissory notes. Onkyo appears to have abandoned any independent argument that GTI failed to prove that it was insolvent, and we deem the argument to be waived. *Brown v. Konteh*, 567 F.3d 191, 212 (6th Cir. 2009) ("[I]ssues not adequately developed or argued in the appellate briefs are deemed abandoned and are thus not addressed by this court."), *cert. denied*, 130 S. Ct. 1081 (2010).

On March 31, 2011, the district court filed an opinion affirming the bankruptcy court's decision. The court held that GTI had satisfied its burden of establishing both the value of the assets received and the value of the assets transferred. *Menchise v. Clark (In re Dealers Agency Servs. Inc.)*, 380 B.R. at 608, 620, 622 (Bankr. M.D. Fla. 2007) (explaining the burden in a fraudulent-transfer case).

The district court held that the bankruptcy court did not err when it used the valuation of the note provided by Onkyo's expert, Risius. Using Risius's value for the notes without adopting his separate opinion that GTI was not rendered insolvent by the transaction was not error, the district court reasoned, noting, "[t]here is no requirement that the trier of fact must adopt an expert's opinion in its entirety."

The district court next held that the bankruptcy court did not err in valuing the indirect benefits GTI received from OAI at zero. The court disagreed that the bankruptcy court used hindsight in determining the value, determining that it assessed the value of the indirect benefits based on the information known to OAI at the time of acquisition. The court determined that OAI's management knew that OAI would be such a financial drain on GTI as of the time of closing and that any value from indirect benefits "was undermined by the cash drain on GTI."

Finally, the district court also disagreed with Onkyo that GTI's expert did not provide a "substantive analysis" of the indirect benefits. The court stated that Conway "saw no evidence of [the indirect benefits'] value because the representations made by OAI's management, who had undisclosed ties to Onkyo Japan and undisclosed financial incentives for selling OAI to GTI, lacked a factual basis." The court determined that the "bankruptcy court 'had sufficient evidence to conclude, based on the totality of the circumstances, that the benefits to the debtor were minimal . . . .'" *Onkyo U.S.A. Corp. v. Global Technovations, Inc. (In re Global Technovations, Inc.)*, Civil Case No. 10-12781, 2011 WL 1297356, at *7 (E.D. Mich. Mar. 31, 2011) (quoting *Pension Transfer Corp. v. Beneficiaries to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 214 (3d Cir. 2006)).

Onkyo filed this timely appeal. This court has jurisdiction to hear bankruptcy appeals once the judgments of the bankruptcy court and the district court are final. 28 U.S.C. § 158(d)(1); *Cottrell v. Schilling (In re Cottrell)*, 876 F.2d 540, 541 (6th Cir. 1989).

## II

On appeal, Onkyo reiterates its arguments that GTI failed to establish the value it paid and the value it received in the OAI transaction. Specifically, Onkyo makes three primary arguments: (1) GTI failed to prove the value of its promissory notes; (2) the bankruptcy court's valuation of OAI's stock was derived using hindsight; and (3) GTI failed to prove the value of all the economic benefits it received.

## A

In a bankruptcy proceeding, the bankruptcy judge is the finder of fact. *Nicholson v. Isaacman (In re Isaacman)*, 26 F.3d 629, 631 (6th Cir. 1994). A district court on appeal reviews the bankruptcy court's factual findings for clear error. It reviews the bankruptcy court's legal conclusions de novo. *Ibid.* In an appeal from the district court, this court "consider[s] the judgment of the bankruptcy court directly, using the same standards of review as the district court." *Ibid.* (internal quotation marks omitted).

Therefore, we review the bankruptcy court's factual findings for clear error. The court's determination that these facts do or do not add up to a fraudulent transfer, however, is a question of law that we review de novo.

## B

In order to resolve the parties' conflict efficiently, we find it useful to reorder Onkyo's arguments from back to front, addressing the value of indirect benefits first, then the bankruptcy court's alleged use of hindsight, and then the value of GTI's promissory notes.

We begin with Onkyo's argument that the bankruptcy court failed to require GTI to prove the value of the indirect benefits it received from OAI. Onkyo terms this a "methodological failure" that should be reviewed de novo.

Onkyo is incorrect that this issue should be reviewed de novo. Contrary to its assertions, the bankruptcy court did analyze the value of the indirect benefits GTI received from OAI. Their value was discussed at trial in detail. Therefore, the bankruptcy court did not fail to consider the value of the indirect benefits, which would have been a legal error. The bankruptcy court merely determined, after weighing the facts, that the correct value for the benefits was zero. This is a matter of *fact*. The court's determination of the amount of value is thus reviewed for clear error. *See, e.g.*, *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 196 F. App'x 337, 341 (6th Cir. 2006).

The indirect benefits at issue, according to Onkyo, were the following:

1) Avoiding de-listing by the American Stock Exchange;

2) Access to substantial credit, leaving GTI with approximately $3 million in cash immediately after the transactions;

3) Exclusive distribution rights for Onkyo's automotive speakers in the Americas;

4) Access to Onkyo patents, trademarks, trade names, technologies, and technological assistance;

5) The ability to move production of GTI oil analyzers to a state-of-the-art production facility in Columbus, Indiana; and

6) Enhanced credibility in the eyes of automotive manufacturers—potential customers for GTI's other product lines.

The bankruptcy court stated that the only indirect benefit that was not "highly speculative and . . . unachievable" was GTI "temporarily avoiding being de-listed from the American Stock Exchange." The court also determined that "the net value to GTI of any such alleged other benefits from the acquisition of OAI was zero or less, because any value from these other benefits was outweighed by the economic damage GTI suffered from acquiring OAI . . . because, as the Court has found, OAI was a serious

cash *drain* on GTI from the time of the acquisition forward." This result, the court emphasized, was not based on hindsight but was "predictable from information known and available to OAI's management, but not disclosed to GTI's management, prior to the acquisition."

Onkyo protests on appeal that GTI failed to provide evidence of the value (or lack of value) for the indirect benefits and that the bankruptcy court refused to consider any value of these benefits. This is, it argues, citing a single Third Circuit case, reversible error. It argues that the value of the indirect benefits is critical because the direct benefits received by GTI (the stock, which was valued at $6.9 million by the bankruptcy court) already equals 53% of the cash paid by GTI. Onkyo therefore believes that the value of the indirect benefits could result in the total value of benefits to GTI reaching the crucial 70% level deemed presumptively reasonable.

It is true, as Onkyo reports, that the Third Circuit has held that a plaintiff has the burden to prove that a benefit is worth zero, and that it may fail to meet its burden if "no calculations are offered into evidence, and there is some evidence that the benefit conferred value." *In re Fruehauf,* 444 F.3d at 214. However, Onkyo is incorrect that the district and bankruptcy court's decisions must be reversed if GTI did not put forth a calculation of indirect benefits.

The first reason that Onkyo is incorrect is found within *Fruehauf* itself. *Fruehauf* specifically established an exception to its general requirement that the plaintiff proffer a calculation of the value of indirect befits:

> This general rule yields to common sense: in those cases where a court has sufficient evidence to conclude, based on a totality of the circumstances, that the benefits to the debtor are *minimal and certainly not equivalent to the value of a substantial outlay of assets*, the plaintiff need not prove the precise value of the benefit because such a calculation is unnecessary to the court's analysis. Moreover, . . . the trier of fact's ultimate determination of whether the values are reasonably equivalent is reviewed only for clear error, even if the court did not convert those values into precise cash quantities.

*Ibid.* (emphasis added).

Moreover, Onkyo is also incorrect because *Fruehauf* does not represent a uniformly applicable rule for establishing the value of indirect benefits in fraudulent-transfer cases.    Some courts, in fact, require that the party who made the transfer—Onkyo, in this case—bear the burden of establishing the value of any supposed indirect benefits.  *See, e.g.*, *Kapila v. Clark (In re Trafford Distrib. Ctr.)*, 431 B.R. 263, 299 (Bankr. S.D. Fla. 2010) (holding that the party against whom the fraudulent transfer was claimed bore the burden, once the debtor showed that it had not received direct benefits in the transfer, of showing that the debtor received indirect benefits that would amount to reasonably equivalent value); *see also In re Wilkinson*, 196 F. App'x at 342 (acknowledging without adopting that defendants may be required to prove the value of indirect benefits).  Because the bankruptcy court's decision withstands scrutiny under *Fruehauf* or the *Kapila* standard, we need not decide at this time this Circuit's position on the applicable burden of proof.

The district court decided that the exception articulated in *Fruehauf* applied to the bankruptcy court's decision.  *See In re Global Technovations*, 2011 WL 1297356 at *6–*7.  We agree that the court's decision falls under the exception, assuming without deciding that the *Fruehauf* standard is relevant.   The court determined, after hearing extensive testimony from both parties' witnesses, that the value of the indirect benefits was "minimal"—in fact, the value was close to or equal to zero.  Moreover, then, the value of the indirect benefits were "certainly not equivalent" to  a "substantial outlay" of $6.02 million, the amount that would be needed to add to the $6.9 million in direct benefits GTI was deemed to have received in the transfer in order to equal $12.92 million, or 70% of the $21.6 that GTI agreed to pay.[4]  Therefore, the bankruptcy court's determination that the indirect benefits were insubstantial was valid without the necessity of providing calculations.  Onkyo's argument must fail.  The court's method was correct as a matter of law and its finding was not clear error.

---

[4]In fact, even if the promissory notes were valued at zero, as Onkyo argued for at trial, and the purchase price for OAI was deemed to have been GTI's $13 million cash payment, the indirect benefits would still have to amount to $2.2 million to add to the $6.9 million in direct benefits GTI was deemed to have received, thus totaling $9.1 million, which would be 70% of the $13 million GTI spent, to make the transfer presumptively reasonably equivalent in value. *In re Goldberg*, 229 B.R. at 884–85.

**C**

Onkyo's second argument is that the bankruptcy court impermissibly relied on hindsight in determining the value of OAI's stock, which the court valued at $6.9 million. Because the court relied on hindsight to determine the value of the stock, Onkyo argues, the court's determination that GTI did not receive equivalent value from Onkyo must be reversed.

Onkyo points to two key areas where it claims the bankruptcy court relied on hindsight: a multiple of earnings derived from transactions that Conway said were similar to the OAI transaction and Conway's calculation of OAI's trailing-12-month EBITDA.

Onkyo argues that the bankruptcy court's application of hindsight is part of the inquiry into the methodology the bankruptcy court used to determine value. Questions of methodology are questions of law to be reviewed de novo. *In re Wilkinson*, 196 F. App'x at 342; *Slone v. Dirks (In re Dirks)*, No. 08-8031, 2009 WL 103606, at *7 (B.A.P. 6th Cir. 2009) (relying on *In re Wilkinson*)).

Methodology, of course, refers to how the court assessed value. The Fifth Circuit describes as follows the methodology behind fraudulent-transfer analysis:

> [T]he clearly erroneous standard [that governs the bankruptcy court's findings of reasonably equivalent value] is subject to modification if the bankruptcy court invokes improper methodology in reaching its conclusion on the issue of reasonable equivalency. Consequently, we review de novo the methodology employed by the bankruptcy court in assigning values to the property transferred and the consideration received.
>
> In the instant case, the methodology employed by the bankruptcy court was appropriate. The bankruptcy court *heard testimony, on direct and cross-examination, from each party's expert appraiser as to his credentials, opinion of the proper valuation, considerations, assumptions, and sources of information.*

*Texas Truck Ins. Agency, Inc. v. Cure (Matter of Dunham)*, 110 F.3d 286, 289 n.11 (5th Cir. 1997) (emphasis added).

We agree with the Fifth Circuit's description of methodology. As a result, we note that the bankruptcy court in this case followed an acceptable methodology. The court conducted a lengthy trial and heard days of testimony from each expert witness. The experts provided several methods for valuing OAI's stock and provided their reasons for each method. They were cross-examined regarding these methods and calculations. The court then credited the portions of expert testimony it believed to be correct.

Furthermore, GTI's expert, Conway, was explicitly cross-examined on the potential for hindsight in his calculations of the multiple and his calculations of OAI's trailing-12-month EBITDA. Conway explicitly stated that he was not relying on hindsight in his projections:

> Q: [Y]ou agree that actual results for [OAI] after 2000 have no support for your projections, is that true?
> A: After August 31st [the day of the transfer of OAI's stock to GTI].
> Q: Right.
> . . .
> A: . . . Actual results are *not to be used unless again you would have predicted those [results] based on information you would have known.* So you *have to put yourself back on August 31st of 2000 what you've* [sic] *known or should have known.*

Similarly, there was another discussion of hindsight later in the cross-examination, with regard to Conway's methodology for selecting a multiple:

> Q: Let's turn to your—the comparable transactions method now. Is it appropriate in using the comparable transaction method to use transactions that were announced *after the valuation date here*, August 31, 2000?
>
> A: It would be—it would be okay if they're within—you know, when you're looking for comparable transactions you're not going to find transactions on August 31st, so you can use them within a reasonable range of time. Otherwise you'd never be able to use this method.
>
> . . . You're not going to be able to go into the data bases and find transactions on August 31st. So you—you have to accept that within a couple of months, maybe even longer, recognizing that the farther out

you go, there may be a risk of—of the value being different, but hopefully not materially different. . . .

Q: There's no way that the *parties would know at the time of the transaction on August 31st, 2000 of a private transaction that had not been announced yet as of that date, right?*

A: That's true.

Q: And so in that sense you're applying hindsight by using transactions that were announced after August 31, 2000, right?

A: I don't think so.  Because in this situation yes, you wouldn't have known about a November transaction.  But whenever anybody looks at the issue of value[, like] the Internal Revenue [Service], they come in to take a look and they can look at transactions within a reasonable time frame.

 Yes, you wouldn't have known at that time.  But as part of the basis if one was to dispute value, I don't think it's unreasonable to pick transactions within the approximate time . . .  Because the valuation disputes like this one are done after the fact. . . . We do have the benefit of hindsight here, but we're using transactions within the relevant time frame.

 . . .

Q: [D]o you generally agree that it's generally better to use private transactions closer to the valuation date?

. . .

A: You'd love them on the same date, so the answer is yes.

The record demonstrates that the bankruptcy court was fully aware of Conway's qualifications, the methods he used to determine value, and of the potential problems with using hindsight to determine OAI's value.  There is no indication that the

bankruptcy court's methodology was flawed.[5] As a result, we cannot agree with Onkyo that the bankruptcy court used hindsight as part of its methodology.

Thus, we are left with the question of whether the bankruptcy court settled on the best value for the OAI stock, and we are reluctant to second-guess the court's factual determination. Circuits generally apply either a clear-error or, if not, very deferential standard of review to a bankruptcy court's determination of reasonably equivalent value, considering the question to be one of fact. The First, Second, Fourth, Fifth, and Eighth Circuits apply a clear-error standard. *See Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 982 (1st Cir. 1983); *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979) ("Fairness of consideration is generally a question of fact."); *Morrison v. Champion Credit Corp. (In re Barefoot)*, 952 F.2d 795, 800 (4th Cir. 1991); *Matter of Dunham*, 110 F.3d at 289; *Jacoway v. McIlroy* (*In re Ozark Rest. Equip. Co.*), 850 F.2d 342, 344 (8th Cir. 1988). The Seventh Circuit, in contrast, gives "great deference" to a bankruptcy court's "findings on the fact-intensive issue of whether the debtor received reasonably equivalent value," but does not apply a clear-error standard. *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 389 (7th Cir. 1997). The Eleventh and Tenth Circuits, also similarly, have held that "whether fair consideration has been given is 'largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts.'" *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593 (11th Cir. 1990); *see also Clark v. Sec. Pac. Bus. Credit, Inc. (In re Wes Dor, Inc.)*, 996 F.2d 237, 242 (10th Cir. 1993) (same).

Only the Ninth Circuit has held that the determination of reasonably equivalent value is subject to de novo review. *See Maddox v. Robertson (In re Prejean)*, 994 F.2d

---

[5]Moreover, there is no indication that using comparable transactions from times preceding and postdating an allegedly fraudulent transaction equates to an impermissible use of hindsight. The "comparable transactions" method Conway used to determine OAI's value is a standard method employed in bankruptcy cases, whether in evaluating solvency or valuing assets. The "comparable transactions" method "examines recent transactions where [similar assets] have been bought and sold on the market . . . [and] is designed to yield the price the [asset] would carry in the marketplace based on similar transactions." *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 545 (Bankr. D. Del. 2002). The methodology centers on transactions that are similar in nature, and there is no case law to suggest that a similar transaction that occurred after the transaction cannot be examined because to do so would draw on hindsight. *See, e.g.*, *Chartwell Litig. Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.)*, 346 B.R. 621, 642 (Bankr. E.D.N.Y. 2006) (describing the comparable-transactions methodology).

706, 708 (9th Cir. 1993). However, the Ninth Circuit Bankruptcy Panel recently ignored this precedent, assuming that the Circuit would now decide the issue differently. *Ehrenberg v. Tenzer (In re Heartbeat of the City, N.W., Inc.)*, Bankruptcy No. LA 99-45650-EC, 2006 WL 6810939, at *5 (B.A.P. 9th Cir. 2006) (noting that "[e]ight other circuits, and the leading treatise, consider the issue a question of fact" and presuming that "under the overwhelming weight of authority," the Circuit would consider "reasonably equivalent value of a transfer to be a question of fact subject to review under the clearly erroneous standard").

The Sixth Circuit has not squarely held that it applies the clear-error standard to a bankruptcy court's determination of reasonably equivalent value, but it has held in unpublished cases that "whether [a debtor] received reasonably equivalent value [in a fraudulent-transfer case] is a question of fact." *In re Wilkinson*, 196 F. App'x at 341 (citing *In re Humble*, 19 F. App'x 198, 200 (6th Cir. 2001) (unpublished) (stating that reasonably equivalent value should be "analy[zed] based upon the facts and circumstances of each particular case")). We take this opportunity to express our agreement with the majority of Circuits and adopt the clear-error standard of review.

The bankruptcy court's adoption of Conway's value based on the comparable-transactions method was not clearly erroneous. Onkyo's argument must fail.

**D**

Onkyo's final argument is that GTI failed to prove the value of its promissory notes. Onkyo states that "[i]t is undisputed that GTI failed to offer evidence of [the] actual value" of the notes. Onkyo argues that the bankruptcy court "plugged the hole" with its expert's value of $8.6 million. The "fundamental problem" with the court using Risius's value, though, according to Onkyo, is that the court rejected Risius's opinion that GTI was not insolvent at the time of or as a result of the transaction. Onkyo argues that the court's finding that the notes were worth $8.6 million cannot be squared with the court's finding that GTI was rendered insolvent "as an immediate result of the OAI acquisition." Onkyo argues that the bankruptcy court made a legal error, reviewable under a de novo standard, and that its judgment must be reversed.

Onkyo's argument is flawed.  First, contrary to Onkyo's claim, GTI's expert did in fact place a value on the notes.  GTI's expert stated at trial that the notes were worth $12 million in present value, an amount equal to their face value.  At trial, Conway and Onkyo's counsel had the following exchange:

> Q: [The] final [purchase] price was $13,000,000 in cash and $12,000,000 in notes, is that right?
>
> A: Yes.
>
> . . .
>
> Q: To determine the value of those notes it is necessary to discount the cash due in the future to a present value at a market insurance rate, is that right?
>
> A: You mean if someone was going to purchase those notes for fair market value?
>
> Q: Yeah . . . .
>
> A: I think that's fair.
>
> Q: Have you calculated the market interest on unsecured notes issued by GTI as of the transaction date?
>
> A: I did not.
>
> Q: And without calculating that rate it is not possible to determine the value of the notes given by GTI as part of the consideration for the [OAI] stock, is that true?
>
> A: Well, that's—*that's not true*.  Because *the value of the notes is the face value of the notes* . . . . They're of for [sic] short term duration.  There's an expectation by the parties they can pay them, so why would one discount them?  Why would one discount those three year notes?  There *may be a de minimis discount* for the interest rate, but they're three year notes agreed to by the parties are [sic] to be paid.

(emphasis added).  As evidenced by the record, Conway clearly argued that the present value of the notes was $12 million, and provided several reasons for his conclusion.  Therefore, Onkyo is wrong that GTI put forth no evidence on the present value of the notes.

The next question is whether the bankruptcy court made a legal error by crediting Risius's value for the notes—$8.6 million—without also crediting his opinion that GTI was not rendered insolvent by the purchase of OAI. Onkyo has again failed to provide any authority stating that, as a matter of law, a bankruptcy court cannot credit certain aspects of expert testimony without crediting all of it, nor that promissory notes must be valued at zero in any fraudulent-transfer case in which the promisor is rendered insolvent at the time it acquires the asset at issue.

Because Onkyo has failed to show that it was legal error for the bankruptcy court to adopt only the value portion of Risius's testimony, the question again becomes one of fact. We must determine then whether the bankruptcy court committed clear error in finding that the notes were worth $8.6 million, in light of the fact that it also found that GTI was rendered insolvent as an immediate result of the OAI acquisition. This was not clear error. The bankruptcy court did not find that GTI was insolvent when it negotiated and executed the notes. *See Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 770–71 (6th Cir. 1995) (stating that the "critical time" for determining whether reasonable equivalent value was given is when "the transfer is made"). It found that GTI was rendered insolvent as a *result* of the acquisition of OAI. The court determined that by adding OAI to its books, GTI became immediately insolvent. But it did not add OAI to the books until after it acquired OAI, and it did not acquire OAI until it paid for OAI—i.e., paid the cash and notes. The district court did not clearly err in finding that the notes were worth a significant percent of their face value when paid even though GTI was rendered insolvent soon after. Moreover, even if the notes were valued at zero, the $6.9 million in value GTI received for OAI was not 70% of the $13 million in cash it paid—therefore, the transfer would still fail to be presumptively reasonable. *In re Goldberg*, 229 B.R. at 884–85. Onkyo's last argument must also fail.

## III

The panel has considered whether the bankruptcy court had jurisdiction to require Onkyo to pay GTI $6.1 million. After supplemental briefing and argument from the parties, we determine that it did.

The question arose in response to the Supreme Court's recent holdings in *Stern v. Marshall*, 131 S. Ct. 2594 (2011). *Stern* dealt with the estate of Vickie Lynn Marshall. *Stern*, 131 S. Ct. at 2595. Marshall declared bankruptcy and Pierce Marshall, the son of Vickie's late husband, filed a proof of claim against her bankruptcy estate. He claimed that Vickie had defamed him, and requested damages from the bankrupt estate. Vickie responded to the proof of claim by arguing that what she had stated about Pierce had been true. *Id.* at 2601. She also filed an unrelated counterclaim against Pierce, claiming that Pierce had tortiously interfered with the gift she should have received from her husband's estate when he died. *Ibid.*

The Supreme Court determined that the bankruptcy court violated the Constitution when it decided the counterclaim for tortious interference. *Ibid.* The Court determined that, though the bankruptcy court was within the jurisdiction conferred by the bankruptcy statute, 28 U.S.C. § 157(b)(2)(C), hearing and determining the claim violated the Constitution because, "in general, Congress may not 'withdraw from [Article III] judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" *Id.* at 2609 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856)).

The Court noted that Vickie's counterclaim was the type of claim that the Court had previously held could not be withdrawn from an Article III court. In *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 53 (1982), for example, the Court held that a bankruptcy court could not adjudicate a "state-law contract claim against an entity that was not otherwise part of the bankruptcy proceedings." *Stern*, 131 S. Ct. at 2609–10 (internal quotation marks removed). Additionally, an entity that *had not* submitted a claim against a bankruptcy estate was entitled to a jury trial when the estate sued it in bankruptcy to recover an allegedly fraudulent transfer, and the bankruptcy court did not use a jury as a factfinder. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 36, 50 (1989). *Stern*'s limited holding stated the following: When a claim is "a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of

claim in bankruptcy," the bankruptcy court cannot enter final judgment. *Id.* at 2611. In those cases, the bankruptcy court may only enter proposed findings of fact and conclusions of law. *Ibid.*

In our case, Onkyo filed a proof of claim against GTI's bankruptcy estate. Thus, the case is fundamentally unlike *Granfinanciera*, where the bankruptcy estate reached out to file a fraudulent-transfer claim against a party who had filed no claim against the estate. Onkyo brought itself voluntarily into the bankruptcy court. The state-law claim in this case, the Florida cause of action for fraudulent transfer, was GTI's defense against Onkyo's proof of claim. It is crystal clear that the bankruptcy court had constitutional jurisdiction under *Stern* to adjudicate whether the sale of GTI was a fraudulent transfer, because "it was not possible . . . to rule on [Onkyo's] proof of claim without first resolving" the fraudulent-transfer issue. *Stern*, 131 S. Ct. at 2616 (citing *Katchen v. Landy*, 382 U.S. 323, 329–30, 332–33, and n.9, 334 (1966)).

What is not crystal clear is whether the bankruptcy court had jurisdiction under *Stern* to make the additional finding that Onkyo was a "good-faith transferee" and a "good-faith obligee" under Florida law. Florida fraudulent-transfer law allows a good-faith transferee a credit—specifically, a "reduction in the amount of the liability on the judgment"—in the amount of the value the transferee gave to the debtor for the transfer or obligation. FLA. STAT. 726.109(4)(c). Thus, in many fraudulent-transfer cases, it will be necessary for the bankruptcy court to make the good-faith-transferee finding in order to determine exactly how much of the debtor's claim to disallow. That finding was not, strictly speaking, necessary here, because of the comparative value of OAI and the cash exchanged. (The bankruptcy court found that OAI was only worth $6.9 million—considerably less than the $13 million in cash that Onkyo had already received. Thus, the court necessarily disallowed the full $12 million in promissory notes that Onkyo sought from GTI in its proof of claim.) However, the bankruptcy court could not have known at the outset whether Onkyo's proof of claim would be disallowed in its entirety—such a determination depended on the amount the court determined OAI was worth. We do not believe that *Stern* requires a court to determine, in advance, which

facts will ultimately prove strictly necessary to resolve a creditor's proof of claim. Therefore, we hold that the bankruptcy court had authority to make the good-faith-transferee finding in the course of resolving GTI's fraudulent-transfer defense.

*Stern* cited with approval the Court's prior precedent holding that a bankruptcy court may award affirmative relief to a debtor after its creditor's proof of claim has been resolved and where "nothing remains for adjudication."  131 S. Ct. at 2616 (citing *Katchen*, 382 U.S. at 334).  In this case, once the bankruptcy court determined that the sale of OAI had been a fraudulent transfer and Onkyo was a good-faith transferee, awarding GTI relief was a simple matter of subtraction.  The bankruptcy court credited Onkyo the $6.9 million it determined OAI was worth at the time of the transfer, and then ordered Onkyo to pay back the remainder—$6.1 million—of the $13 million it had received from GTI.  We hold that the court had jurisdiction under *Stern* to enter this judgment.

**IV**

For the foregoing reasons, the judgment of the district court is AFFIRMED.