**In the matter of Dennis H. McDOWELL, Debtor.**

**No. 11–13519–WHD.**

United States Bankruptcy Court,
N.D. Georgia,
Newnan Division.

Signed March 4, 2014.

James G. Baker, LaGrange, GA, Trustee.

J. Michael Lamberth, Lamberth, Cifelli, Stokes, Ellis & Nason, Atlanta, GA, for James G. Baker, Trustee.

J. Nevin Smith, Smith Conerly LLP, Carrollton, GA, for Debtor.

R. Jeneane Treace, Office of the United States Trustee, Atlanta, GA, for U.S. Trustee.

## *ORDER*

W. HOMER DRAKE, Bankruptcy Judge.

This matter comes before the Court on a *Motion to Approve Compromise and Settlement Agreement* (hereinafter the "Motion") filed by James G. Baker (hereinafter the "Trustee"), in his capacity as Chapter 7 Trustee for the estate of Dennis H. McDowell (hereinafter the "Debtor"). In addition to the Trustee and the Debtor, other parties to the Settlement Agreement (hereinafter the "Agreement") include Jackie Sue Duke McDowell; Dennis H. McDowell, II; Sherry Husby; Josh Husby; Joe Husby; Christian McDowell; Dennis Hunter Ray McDowell; D.H. McDowell Family LLLP (hereinafter the "FLP"); and Griffin Howell, III, Chapter 7 Trustee for the estate of Dennis H. McDowell, II (collectively the "Settlement Parties"). Bank of North Georgia (hereinafter "BNG") opposes the Motion. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 157(b)(1), as a core proceeding defined under 28 U.S.C. §§ 157(b)(2)(A) & (O). *See also* 28 U.S.C. § 1334.

### *Procedural History and Statement of Facts.*

On October, 24, 2011, the Debtor filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code.[1] Griffin Howell, III was initially appointed as Trustee for the estate, but on April 16, 2012, Howell resigned his appointment. Thereafter, the United States Trustee assigned James G. Baker to administer the Debtor's estate. Following his appointment, the Trustee diligently investigated the financial affairs of the Debtor. The Trustee participated in 2004 examinations of the Debtor; Dennis H. McDowell, II (Debtor's son); Keith Bollendorf (business associate of the Debtor); and Larry Terrell (tax preparer for the FLP). Additionally, he reviewed the deposition testimony of Jackie McDowell (Debtor's wife) and Sherry Husby (Debtor's adult daughter). Moreover, a substantial number of other documents were supplied to the Trustee by interested parties, including BNG.

After undertaking his investigation, the Trustee found it appropriate to file a complaint against the Debtor and the Settlement Parties. On August 8, 2013, he initiated two adversary proceedings that were ultimately consolidated, the substance of which provides the underlying motivation for the Agreement before the Court today. The Trustee's complaint sought recovery for the benefit of the estate of a number of assets, including substantial assets known as (1) Debtor's individual Merrill Lynch Account, with a balance as of October 31, 2012 of $3,818,728.89; (2) the Bull Creek Ranch property, with an estimated value of approximately $4,000,000.00; (3) the Crone Note, with an estimated value of approximately $500,000.00; and (4) Debtor's 49% interest in the FLP, with an estimated value of approximately $9,000,000.00.[2] For his purposes, the

---

1. 11 U.S.C. § 101 *et seq.*

2. The overall value of the FLP has fluctuated, but was estimated to be approximately $18,000,000 as of January 4, 2011.

Trustee asserted multiple bases for recovery: (1) resulting and constructive trusts; (2) fraudulent transfer; and (3) ineffective gifting.

The Trustee, the Debtor, and the Settlement Parties entered into discussions for the purpose of resolving the adversary proceeding, but no resolution was forthcoming. On September 11, 2013, the parties requested to mediate this case before Judge Paul Bonapfel, United States Bankruptcy Judge for the Northern District of Georgia. By Order, the Court granted their request on September 16, 2013. The mediation transpired on October 4, 2013. Following nine and a half hours of negotiation proceedings, the parties reached a settlement in resolution of the Trustee's claims, the terms of which the parties subsequently memorialized into the Agreement before the Court. Essential to the Court's review are the following:

    (b) *Settlement Amount.* The Debtor, Jackie Sue Duke McDowell, and the FLP will pay or cause to be paid to the Trustee $2,050,000.00 (two million and fifty thousand dollars) as the settlement amount (the *"Settlement Amount"*). The Trustee will pay to Trustee Howell $50,000 from the Settlement Amount....

    (d) *Dismissal of Litigation.* Within seven (7) days after receipt of the Settlement Amount, the Trustee will file a motion in the Litigation [requesting the Court to dismiss the adversary proceeding(s)].

    (e) Effective upon the Trustee's receipt of the Settlement Amount, the following described interests in property of the Debtor's bankruptcy estate will be deemed abandoned by the Trustee: subject to limitations provided for in 1(g) below, all property listed by Debtor in his schedule "A" or schedule "B", as amended....

    2. *Releases.*

        [multiple releases for the Trustee, Debtor, and Settlement Parties from any and all claims, as defined in the Agreement, of any kind that the Trustee, Debtor, or member of the Settlement Parties has or may claim to have now or in the future connected with any commission or omission as of the date of the Agreement]

*Trustee's Mot. to Approve Compromise,* Ex. A., at 3–6.

The Trustee filed this Motion on January 10, 2014. BNG's formal objection was filed on February 5, 2014. On notice to all creditors, the United States Trustee, and the Settlement Parties, the Court conducted a hearing on February 7, 2014 to consider whether to approve the Agreement. Present at the hearing were the Trustee, counsel for the Trustee, Trustee Howell, counsel for Trustee Howell, the Debtor, counsel for both the Debtor and the Settlement Parties, counsel for BNG, and counsel for both Charter Bank and Southern States Bank. At the hearing, the Court permitted, without objection, the Trustee's request to proffer what his testimony would be if required to take the stand. Additionally, the Court allowed all present parties to present their positions regarding the Agreement. Upon the conclusion of the hearing, the Court took the matter under advisement for further consideration.

### Conclusions of Law.

■ Based on the proffer, the Trustee determined that the Agreement is in the best interest of the estate and its creditors, that he came to this determination by means of his business judgment, and that he recommends the Court approve the Agreement. The Trustee proffered that his primary duty requires him expeditiously to turn assets of the Debtor into cash and distribute the funds to creditors. Of

particular benefit to the Trustee, this Agreement ensures that the estate's creditors receive a distribution and that these proceeds can be distributed in a relatively short period of time. The Trustee also expounded on many concerns, beyond the inherent risks, with this litigation, many of which potentially negate recovery in their entirety, including: (1) statute of limitations defenses, (2) solvency questions, and (3) potential *Stern v. Marshall*[3] issues.

BNG is the fourth largest creditor, holding approximately thirteen percent (13%) of the claims on the estate. Claims on the estate amount to $50,256,595.10. The Debtor owes BNG $6,461,377.97. BNG primarily objects because, in its opinion, the Trustee failed to set forth a settlement proposal that falls within the range of reasonableness. BNG contends that the Debtor's fraudulent actions amount to over $20 million being removed from the estate, and if the Court approves the settlement, it not only sanctions the unlawful actions of the Debtor, but also rewards him with an $18 million boon. In the opinion of BNG, there are indeed aspects that favor settlement, however, not at such a steep discount in light of the relevant factors.

▆▆ When a bankruptcy court evaluates whether to approve or disapprove a settlement agreement, it must consider: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir.1990) (quoting *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir.1986)) *cert. den.*, 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990). In making its evaluation, the Court must not rest its approval of any proposed settlement on a resolution of the ultimate factual and legal issues underlying the compromised disputes. *Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Serv., Inc.)*, 762 F.2d 185, 189 (2nd Cir.1985). Rather, the Court should consider the probable outcomes of the litigation, including its advantages and disadvantages, and make a pragmatic decision based on all equitable factors. *Florida Trailer and Equip. Co. v. Deal*, 284 F.2d 567, 571 (5th Cir.1960).[4]

*Factor 1: Probability of Success in the Litigation.*

BNG believes that the Trustee has, at the least, a reasonable likelihood of success in the litigation. According to BNG, there is a clear "paper trail," and this documentary evidence and testimony "unequivocally support" the Trustee's claim of fraudulent transfers totaling over $20 million. Moreover, BNG agrees that the evidence supports the Trustee's claims of ineffective gifting with regards to the Debtor's 49% interest in the FLP. Ultimately, BNG contends that the potential reward to the estate more than outweighs any potential risks associated with the litigation.

The Trustee spoke of the inherent risk associated with any litigation, focusing on the nominal return to creditors in the event of failure, but primarily concentrated

---

**3.** ——— U.S. ———, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

**4.** Decisions by the former Fifth Circuit, issued before October 1, 1981, are binding as prece-

dent in the Eleventh Circuit. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc*).

on the pitfalls that plagued the landscape were this case to go forward without approval of the Agreement. First, the Trustee was concerned with the Debtor's statute of limitations defenses. The Debtor filed his petition in October of 2011. Many of the transactions, including all but 9% of the 49% FLP transfer, took place in or before 2007, more than four years before the petition date. The Trustee pointed out that under Georgia law there is a four year statute of limitations with regards to fraudulent transfers, and though the Trustee retains an argument for why those bars should not apply, he considered their existence when acceding to this Agreement.

The Trustee also expressed concern with the Debtor's solvency defenses. Apparently, much of the Debtor's net worth was invested in a fluctuating real estate market. To prevail under either of Georgia's two fraudulent transfer provisions, "a plaintiff ultimately must prove: ... (3)[the] [d]efendant was insolvent or likely to become insolvent" at the time or as a result of the questionable transfer. *Atlanta Fiberglass USA, LLC v. KPI, Co., Ltd.*, 911 F.Supp.2d 1247, 1265 (N.D.Ga.2012) (internal quotations omitted) (citing Official Code of Georgia Annotated §§ 18–2–74(a) & 18–2–75(a)). With a large portion of the Debtor's assets tied up in an uncertain market, the Trustee contends that with some of the suspect transfers, the Debtor's solvency at the time he made the transfers would be a serious issue.

Finally, the Trustee displayed unease with the Court's authority to issue a final judgment in this case, in light of *Stern v. Marshall*, — U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) and its uncertain ramifications. In *Stern*, the Supreme Court held that when a claim is "a state law action independent of the federal bankruptcy law and not necessarily resolv-

able by a ruling on [a] creditor's proof of claim in bankruptcy," a bankruptcy court lacks constitutional authority to enter a final judgment. *Stern*, 131 S.Ct. at 2611. Additionally, the Supreme Court held in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) that when an entity, which had taken no part in the bankruptcy process, is sued on behalf of the bankruptcy estate seeking to recover a fraudulent transfer, the entity is entitled to a jury trial as a private right that Congress cannot divest by relabeling it and assigning it to a specialized non-article III court. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 36–50, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). Extrapolating from the Supreme Court's decisions, the Sixth Circuit suggested that Stern and *Granfinanciera* combined to stand for the proposition that where a bankruptcy estate reaches out to file a fraudulent transfer claim against a party who makes no claim on the estate, the Bankruptcy Court has no authority to issue a final ruling. *In re Global Technovations, Inc.*, 694 F.3d 705, 722 (6th Cir. 2012). Although there is debate about the Court's authority and whether defendants can waive the jurisdictional issue deriving from Stern, compare, *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553 (9th Cir. 2012), *cert. granted,* — U.S. ——, 133 S.Ct. 2880, 186 L.Ed.2d 908 (2013) with *Waldman v. Stone*, 698 F.3d 910, 918 (6th Cir.2012), *cert. den.,* — U.S. ——, 133 S.Ct. 1604, 185 L.Ed.2d 581 (2013), its existence causes uncertainty to any ruling by this Court. Moreover, assuming that none of the Settlement Parties filed proofs of claim against the estate, as it appears that none have, *Granfinanciera* seemingly entitles the Defendants to a jury trial, subjecting the Trustee's case to all the elevated risk associated with such proceedings. *See Granfinanciera*, 492 U.S. at 36–50, 109 S.Ct. 2782.

*Factor 2: The Difficulties, if Any, to be Encountered in the Matter of Collection.*

BNG argues that the ordinary difficulty in identifying assets for liquidation has been assuaged in these proceedings. In this case, the Trustee knows the assets and their rough evaluations.[5] By BNG's calculation, at least $10 million of identified property is fairly liquid.[6]

The Trustee agrees with BNG's assessment insofar as his ability to identify the assets. However, he maintains that other than the Individual Merrill Lynch Account, nothing is easily "monetized." Real property takes time and effort to market at or near fair market value. Moreover, nearly half of the transferred assets are comprised of units of the FLP. The Trustee expressed considerable doubt as to what actions he could take with regard to the partnership. In fact, he articulated uncertainty as to whether he could be a partner beyond a mere economic sense. Would he have the authority to make decisions or sell assets? Would this role require him to fight the other unit-holders tooth and nail for every painstaking scrap? Would wrapping up or liquidating a portion of this family partnership require the appointment of a receiver? These were all questions that plagued the Trustee. It was expressed at the hearing that getting the judgment is the easy part; the practical realities of collecting on it is another matter. Ultimately, the Trustee's independent assessment presents the process of collection as more difficult than BNG char-

acterizes, with little "low hanging fruit" for the Trustee's pickings.

*Factor III: Complexity of the Litigation, and Expense, Inconvenience, and Delay Necessarily Attending it.*

BNG argues that the actual litigation in this matter only appears cumbersome because of the number of parties involved and the total value of assets transferred, but insists that the legal questions and claims are straightforward, with very little complexity. Moreover, BNG stresses that the majority of the Trustee's work has been completed. The Trustee was blessed with an opportunity to benefit from extensive work conducted by interested third parties, primarily BNG. Consequently, BNG maintains that the previously completed work shall expedite any pretrial period, including discovery, and ease the expenses and burdens of the Trustee. Moreover, considering the value on the table, prosecution of the case justifies a little delay.

The Trustee believes that, despite the efforts already expended by BNG and other interested parties and assuming the Court's denial of the Trustee's Motion, the parties are looking at years—not months—worth of litigation with no certainty in the outcome. The Trustee voiced concern over the potential delay of settling the *Stern* questions. Although the primary elements of the Trustee's claims may be straight forward, the tangential elements of *Stern* considerably elevate the

---

**5.** In a related, but alternative argument, BNG maintains that although valuations were previously completed on the transferred property, the parties are not certain what the total values are today, and BNG argues that the Court cannot adequately evaluate the compromise without holding an evidentiary hearing as to what the full value of the assets on the table should otherwise be. The Court disagrees. That line of argument merely distracts the Court from the totality of the larger

picture. The parties provided enough information for the Court comparatively to evaluate the settlement amount against the Trustee's full claim, as a factor to be considered.

**6.** These assets account for the Individual Merrill Lynch Account, the Crone Note, and the Bull Creek Ranch and other real property transfers.

complexity, especially in lieu of differing approaches taken by the circuits. Additionally, the *Stern* issues require attention before any court addresses the substance of this litigation. Assuming the respective parties exhaust their appellate rights, the litigants are contemplating years of litigating a jurisdictional issue before undertaking the core of the Trustee's complaint.

When it comes to the essence of the litigation, the costs of contesting the Debtor's solvency defense also troubles the Trustee. The Trustee explained that he foresees expending six-figures for the hiring of a forensic accountant, whose sole purpose shall be identifying the Debtor's insolvency at the time of or as a result of each transaction. The Trustee feels the Agreement justifiably avoids this excessive expense and inconvenience.

Finally, assuming the Trustee disposes of these hurdles, he must still wind up the estate. Assuming the Trustee possesses the legal authority to act within the FLP, he believes the partnership will inevitably require the appointment of a receiver, whose duties, the Trustee estimates, could take 3-4 years to complete sufficiently.

The Trustee takes the position that the Agreement avoids the inconvenience and delay caused by *Stern* and the actual difficulties connected with liquidation of the estate. Simultaneously, the Trustee accounts for the inherent complexity and expense associated with a case as cumbersome as this one, while factoring in the risk previously discussed, and concludes that the Agreement is in the best interests of the estate.

*Factor IV: The Paramount Interest of the Creditors and a Proper Deference to their Reasonable Views in the Premises.*

The Court previously discussed many of the positions that BNG holds with regards to this Motion. However, certain interests of the creditor fail to align with any of the other factors, and the Court would feel remiss should it overlook them. The settlement amount comprises a mere fraction of the overall debts in this case and shall provide an extremely modest dividend; more importantly perhaps, it comprises a mere fraction of the assets that the Trustee's complaint alleges the Debtor fraudulently removed from the estate, the recovery of which could provide a more impressive dividend. Moreover, BNG fears that the releases contained in the Agreement will cause the Debtor to become "judgment proof." BNG currently seeks a denial of the Debtor's discharge by prosecuting its own separate adversary proceeding against the Debtor. Because the releases permit the transferred assets to remain in the names and custody of the transferees, BNG fears that, even assuming a denial of the Debtor's discharge, there will be little or no actionable recovery against the Debtor, post-bankruptcy, on the executed guarantees. Expecting both a low dividend and no further meaningful recourse against the Debtor, BNG feels doubly victimized by the Agreement.

BNG was not the only creditor appearing at the hearing, however, and the Court is required to give credence and display proper deference to the interests and perspectives of all creditors, not just those objecting. Counsel for both Charter Bank and Southern States Bank presented the banks' support of the Agreement. These banks represent the sixth and eighth largest creditors of the estate, collectively possessing $5,376,428.52 of the claims, estimated as approximately 10% of total claims. Counsel for these banks stated that these banks involved themselves throughout the process. While they recognize the tremendous loss incurred, they support the Agreement's approval. Counsel took the position that BNG's numbers presume both success in the litigation and

successfully liquidating *all* of the transferred assets. Agreeing with the Trustee, the banks likewise show concern with *Stern,* the Debtor's solvency defenses, and the statute of limitations defenses, as well as the feasibility of collection. The banks favor the certainty of receiving a guaranteed distribution within a reasonable time and believe that by confirming the Agreement, the Court provides a foreseeable conclusion to this case.

Additionally, the Court notes that creditors holding approximately 77% of the claims failed to attend the hearing. The Court can only assume that these creditors have no position on the matter and acquiesce to the approval of the Agreement.

### Conclusion.

■ The approval of a compromise or settlement in a bankruptcy case resides within the sound discretion of the Bankruptcy Court and will not be disturbed or modified on appeal unless the appellate court finds the approval or disapproval of the settlement to constitute an abuse of discretion. *Rivercity v. Herpel (In re Jackson Brewing Co.),* 624 F.2d 599, 602–03 (5th Cir.1980).[7] For a Court to exercise properly its discretion, it must consider, based on the information before it, whether the proposed compromise or settlement falls within the "lowest point in the range of reasonableness." *Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Serv., Inc.),* 762 F.2d 185, 189 (2nd Cir.1985); *In re Upshur,* 2006 WL 6591826, at *1 (Bankr.N.D.Ga.2006) (Bihary, B.J.).

Having considered the pleadings and arguments of counsel within the context of the *Justice Oaks* factors, the Court finds that the Agreement does not fall below the "lowest point in the range of reasonableness." Undoubtedly, the Trustee could have reached a settlement that resulted in more favorable treatment to BNG and the other creditors, but it is not the Court's prerogative to micromanage affairs that have been entrusted to the Trustee. The Court's only duty is to ensure that the settlement reached is fair and equitable and reasonable in light of the circumstances presented. *Tri–State Financial, LLC v. Lovald,* 525 F.3d 649 (8th Cir.2008) (quoting *In re Martin,* 212 B.R. 316, 319 (8th Cir. BAP 1997)); *In re Grot,* 291 B.R. 204 (Bankr.M.D.Ga.2003). In light of the proffer, the Court believes the Trustee satisfied his burden. Particularly, the Court finds persuasive the considerations involving the Trustee's accounting for the jurisdictional issues associated with *Stern* and its predecessors and progeny, the Debtor's and Settlement Parties' defenses to claims, the Trustee's assessment of the FLP's collection feasibility, and the counterbalancing interests of the appearing creditors.

Accordingly, it is hereby

**ORDERED** that the Trustee's *Motion to Approve Compromise and Settlement Agreement* is **GRANTED.** The Trustee is authorized to proceed in whatever manner necessary to consummate the Agreement and carry out its provisions.

The Clerk is **DIRECTED** to serve a copy of this Order on the parties identified in the Distribution List.

**IT IS ORDERED.**

---

7. *See supra* note 4 and accompanying text.