RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0186p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

KENTUCKY EMPLOYEES RETIREMENT SYSTEM; BOARD
OF TRUSTEES OF KENTUCKY RETIREMENT SYSTEMS,

　　　　　　　　*Appellants/Cross-Appellees*,

　　*v.*

SEVEN COUNTIES SERVICES, INC.,

　　　　　　　　*Appellee/Cross-Appellant*.

┐
│
│
│
│  > Nos. 16-5569/5644
│
│
│
┘

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:15-cv-00025—David J. Hale, District Judge.

United States Bankruptcy Court for the Western District of Kentucky at Louisville.
No: 13-31442; Adv. Pro. 13-03019—Joan A. Lloyd, Judge.

Argued: November 30, 2017

Decided and Filed: August 24, 2018

Before: COLE, Chief Judge; McKEAGUE and STRANCH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Tyson A. Crist, ICE MILLER LLP, Columbus, Ohio, for Appellants/Cross-Appellees. G. Eric Brunstad, Jr., DECHERT LLP, Hartford, Connecticut, for Appellee/Cross-Appellant. **ON BRIEF:** Tyson A. Crist, Daniel R. Swetnam, Victoria E. Powers, ICE MILLER LLP, Columbus, Ohio, for Appellants/Cross-Appellees. G. Eric Brunstad, Jr., DECHERT LLP, Hartford, Connecticut, David M. Cantor, SEILLER WATERMAN LLC, Louisville, Kentucky, Paul Hershberg, GRAY & WHITE, Louisville, Kentucky, for Appellee/Cross-Appellant.

　　　STRANCH, J., delivered the opinion of the court, in which COLE, C.J., joined. McKEAGUE, J. (pp. 18–37), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

JANE B. STRANCH, Circuit Judge.    This case arises out of an attempt by Seven Counties Services, Inc., a nonprofit provider of mental health services, to rehabilitate its finances by filing for reorganization under Chapter 11 of the Bankruptcy Code.    For decades, Seven Counties has participated in Kentucky's public pension plan, the Kentucky Employees Retirement System (KERS or the System).    But because the rate set for employer contributions has drastically increased in recent years, Seven Counties now seeks to use these proceedings to reject its relationship with KERS.    The bankruptcy court and the district court both held that Seven Counties is eligible to file under Chapter 11 and that the relationship between Seven Counties and KERS is based on an executory contract that can be rejected in bankruptcy. Because the Commonwealth of Kentucky does not exercise the necessary forms of control over Seven Counties, we **AFFIRM** the conclusion that Seven Counties is eligible to file.    But, lacking guidance from the Kentucky state courts, we **CERTIFY** the question of the nature of the relationship to the Kentucky Supreme Court.

## I.  BACKGROUND

Seven Counties is a Kentucky nonprofit that has provided mental health services in the area surrounding Louisville, Kentucky since 1978.    In its role as a community mental health center (CMHC), Seven Counties provides services to approximately 33,000 people, serving as a safety net for adults and children with mental illnesses, emotional or behavioral disorders, developmental or intellectual disabilities, and alcohol or drug addictions.

CMHCs like Seven Counties have provided mental health services in Kentucky since the 1960s.    In 1963, Congress passed the Mental Retardation Facilities and Community Mental Health Centers Construction Act, which provided federal funding to establish CMHCs.  Pub. L. No. 88-164, 77 Stat. 282 (1963).    Before that time, mental health services in Kentucky, like in most states, were largely provided by the state government.    With the newly available federal funding, Kentucky embarked on a plan to provide services through CMHCs, including by

passing laws that enabled their creation and regulation. Seven Counties' predecessor in the Louisville area, a nonprofit that eventually became known as River Region Mental Health-Mental Retardation Board, was founded at that time.

When River Region and the other new CMHCs formed in 1966, they began providing local services that had previously been provided by the Kentucky Department of Mental Health. Many of the CMHCs' new employees had previously been Department employees. Those employees were reluctant to leave the state system and thereby give up the retirement benefits they had been accruing in the state public pension system, KERS.[1] In response to the employees' dilemma, the Governor issued an executive order declaring that "community mental health boards are permitted to become and are participating agencies in the Kentucky Employe[e]s Retirement System." Ky. Exec. Order No. 66-378 (June 23, 1966). The order did not distinguish between newly hired employees and those who were transitioning from state employment. Three CMHCs declined to participate; the remainder became part of KERS.

In 1978, River Region filed for reorganization and then for bankruptcy under Chapter XI of the Bankruptcy Act of 1898. That same year, Seven Counties was incorporated and became the designated CMHC for the area formerly served by River Region. As the bankruptcy court concluded, "[e]xcept for adopting its separate corporate identity and not assuming debt, Seven Counties was the direct successor to River Region for all business and regulatory purposes." *In re Seven Ctys. Servs., Inc.* (*Ky. Emps. Ret. Sys. v. Seven Ctys. Servs., Inc.*), 511 B.R. 431, 443 (Bankr. W.D. Ky. 2014), *aff'd in part, rev'd in part*, 550 B.R. 741 (W.D. Ky. 2016).

But Seven Counties was not automatically pulled into KERS. Approximately six months after Seven Counties formed, its executive director sent a letter to the Kentucky Retirement Systems—the body that administers KERS—about Seven Counties' participation in KERS. Seven Counties then sent a letter to the Attorney General asking whether it was eligible to participate in KERS. The Attorney General's response cited the provision in Kentucky law that

---

[1]KERS is a cost-sharing, multiple-employer, defined-benefit retirement plan. It is not an individual defined-contribution account, such as a 401(k). KERS is administered by the Kentucky Retirement Systems, which also administers separate retirement systems for county employees and for the state police. Both KERS and the Board of the Kentucky Retirement Systems are parties to this suit.

allows an entity to become a participating "department" in KERS upon issuance of an executive order, Ky. Rev. Stat. § 61.510(3), and concluded that because Seven Counties "appears to be [River Region's] newly created successor, it is our opinion that [Seven Counties] employe[e]s may begin to participate in the KERS upon the issuance of an Executive Order from the Governor to that effect." Ky. Op. Att'y Gen. No. 78-685, 1978 WL 26239 (Oct. 4, 1978). According to the minutes from a Seven Counties board meeting the following month, Seven Counties then "petition[ed] . . . the Governor to sign an Executive Order to allow [Seven Counties] to join KERS." In January, the Governor issued an executive order "designat[ing] Seven Counties Services, Inc. as a participating department in the Kentucky Employe[e]s Retirement System." Ky. Exec. Order No. 79-78 (Jan. 24, 1979).**2**

In recent years, participation in KERS has become a heavy financial burden for Seven Counties. A brief summary suffices to explain the nature of a complex problem. KERS is a defined benefit plan. Participating employers and their employees pay into the System at a set rate and then, upon retirement, the System pays out the defined benefit at a rate determined by multiplying the employee's final compensation, the "benefit factor," and the number of years of service credit. If the rates at which employees and employers pay into the System are not set appropriately, KERS can become underfunded. The subset of KERS in which Seven Counties participates (known as the "non-hazardous plan") was fully funded as recently as 2000. But as of 2013, when Seven Counties' petition was filed, the General Assembly had failed for years to budget sufficient funds to make the actuarially required contribution that would ensure the financial health of KERS. To make the situation worse, KERS's assets declined substantially in value during market downturns in 2000–01 and 2008–09, and the legislature approved but did not fund cost-of-living adjustments to respond to inflation. The burden of this shortfall falls on the employers participating in KERS. (Employee contribution rates, KERS's other source of income aside from investment returns, are capped by statute. *See* Ky. Rev. Stat. § 61.560(1).)

---

**2**The procedure to gain entry into KERS has changed in the intervening years. In 2003, the statutes governing participation in KERS were amended to provide that an employer may participate only as long as it is "qualified" to do so. Ky. Rev. Stat. § 61.520(1), (4)(a). From at least that time—and perhaps for a few years before—KERS has required documentation from new employers seeking to join the System that proves their status as a governmental entity. No such requirement was in place when Seven Counties petitioned and was allowed to join KERS in 1978.

Recognizing the funding crisis in its public pension system, Kentucky's General Assembly phased in increased employer contribution rates starting in 2008, and then, in 2013, began requiring employers participating in KERS—including the State itself—to contribute at the full, actuarially required rate going forward. *See* Ky. Rev. Stat. § 61.565. Aware of the burden this placed on some participating employers, the legislature provided assistance to CMHCs, keeping their rates somewhat lower than those of other employers in the System. Nonetheless, Seven Counties' contribution rates rose well above their historic single-digit range. By the time Seven Counties filed its petition in April 2013, its contribution rate was just under 24% of wages—and was set to increase to almost 27% in a few months.

According to the bankruptcy court, at an employer contribution rate of 24%, "Seven Counties can perform its charitable mission or pay System contributions that will force it to terminate operations. It cannot do both." *In re Seven Ctys. Servs.*, 511 B.R. at 453. And as of 2013, there was no statutory mechanism by which Seven Counties could withdraw from KERS.[3] So Seven Counties filed a Chapter 11 petition, seeking a way to shed its ongoing obligation to participate in KERS. If Seven Counties is permitted to withdraw, KERS estimates that it will leave behind a shortfall of over $90 million to be picked up by other employers in the System—and, ultimately, Kentucky taxpayers.

The proceedings since filing have been lengthy and convoluted. In the instant matter, KERS appeals the dismissal of its complaint in an adversary proceeding. In that complaint, KERS made two basic arguments: (1) that Seven Counties is a "governmental unit" and therefore ineligible to file under Chapter 11, and (2) that Seven Counties should be required to comply with its statutory obligations to make contributions and reports to KERS during the pendency of bankruptcy proceedings. In the same proceeding—and addressed by the bankruptcy court in the same ruling—Seven Counties filed a motion seeking to reject its obligation to contribute to KERS as an executory contract. The bankruptcy court found in favor of Seven Counties on all counts. *See In re Seven Ctys. Servs.*, 511 B.R. at 437. The district court affirmed.

---

[3]In 2015, the General Assembly passed a law allowing an employer to voluntarily withdraw from KERS upon paying withdrawal liability. *See* Ky. Rev. Stat. § 61.522(3)(a).

## II. ANALYSIS

This court reviews the bankruptcy court's decision directly, affording no deference to the intervening district court decision. *Onkyo Eur. Elecs. GMBH v. Glob. Technovations, Inc.* (*In re Glob. Technovations, Inc.*), 694 F.3d 705, 714–15 (6th Cir. 2012). The bankruptcy court's legal conclusions are reviewed de novo and its factual findings for clear error. *Id.* at 715.

### A. "Governmental Unit"

We first address whether Seven Counties is eligible to file under Chapter 11 at all. Seven Counties is only eligible to be a debtor under Chapter 11 if it is a "person" within the meaning of the Bankruptcy Code. *See* 11 U.S.C. § 109(a). "Governmental unit[s]" are—for the most part— specifically excluded from the category of "person." *Id.* § 101(41). This exclusion is logical because governments are not like traditional debtors. The taxation powers of governments are only indirectly analogous to individual or corporate sources of income; their obligations to their citizens have no private analogue. And federal interference with state and local governance via bankruptcy raises unique constitutional concerns. *See United States v. Bekins*, 304 U.S. 27, 51– 52 (1938). Chapter 9 of the Bankruptcy Code, which governs municipal bankruptcy, is designed to operate in those unique circumstances, *see, e.g.*, 11 U.S.C. § 109(c)(2) (allowing municipal bankruptcy only if specifically authorized by state law); Chapter 11 is not. Thus, if Seven Counties is a "governmental unit," it is not eligible for relief under Chapter 11 and its petition must be dismissed. By definition, any "department, agency, or instrumentality of . . . a State" is a "governmental unit." 11 U.S.C. § 101(27).[4]

On appeal, KERS argues that Seven Counties is an instrumentality of the Commonwealth of Kentucky; Seven Counties responds that it is not. Neither this court nor any of our sister circuits has developed a test to determine whether an entity is a state instrumentality within the meaning of § 101(27). The parties point to a number of sources to aid in developing such a test here.

---

[4]The statutory definition of governmental unit also includes municipalities. *See* 11 U.S.C. § 101(27). To the extent the dissent may be read to raise a concern that municipalities could be excluded from the governmental unit category by virtue of how "instrumentality" is defined, *see* Dissenting Op. at 37, that concern is misplaced.

First, Seven Counties invites us to follow our decision in *Halikas v. River Region Mental Health-Mental Retardation Board* ("*River Region*"), No. 80-5433 (6th Cir. Oct. 22, 1981) (order). The bankruptcy and district courts in that case both squarely held that River Region, Seven Counties' predecessor, was not a state instrumentality and so was eligible to file for bankruptcy. *See In re River Region Mental Health-Mental Retardation Bd., Inc.* (*Greenberg v. River Region Mental Health Mental Retardation Bd., Inc.*), No. BK 78-00193-L, slip op. at 40–43 (Bankr. W.D. Ky. Jan. 8, 1980), *aff'd*, No. BK 78-00193-L, slip op. at 8 (W.D. Ky. Sept. 11, 1980). Our affirmance was unpublished and did not explain its reasoning; the statutory scheme at issue there was also different from the scheme here. (The term "governmental unit" was not introduced into law until the 1978 Bankruptcy Code was passed several months after River Region filed its petition. *See* Pub. L. No. 95-598, 92 Stat. 2549 (1978).) The case is therefore not binding. Nonetheless, in light of "the Supreme Court's directive not to 'read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure,'" *Ice House Am., L.L.C. v. Cardin*, 751 F.3d 734, 739 (6th Cir. 2014) (quoting *Hamilton v. Lanning*, 560 U.S. 505, 517 (2010)), *River Region* can provide support for the proposition that Seven Counties should, like its predecessor, be given the benefit of access to Chapter 11 proceedings.

We must still determine whether Seven Counties is an "instrumentality" of the Commonwealth of Kentucky under the current statutory scheme. We look first to the text of the statute, but the Bankruptcy Code does not define the term. Common definitions provide some help, but do not decisively resolve the issue. For example, *Black's Law Dictionary* defines an instrumentality as either "[a] thing used to achieve an end or purpose" or "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body." *Black's Law Dictionary* (10th ed. 2014); *see also Webster's New Int'l Dictionary* 1172 (3d ed. 1961) (defining instrumentality as "something by which an end is achieved" or "something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out"). Seven Counties concedes, albeit in a slightly different context, that its work providing a safety net of mental health care serves a public purpose, so at least one aspect of these definitions would seem to be satisfied. But these definitions also contemplate an entity "us[ing]" or "controlling" its instrumentality. Governmental control

therefore plays a critical role in identifying state instrumentalities. In this conclusion, we are not at odds with the dissent, which acknowledges that the plain meaning of the word "instrumentality" requires "a degree of sovereign control." Dissenting Op. at 21. The core of the dissent's disagreement appears to be with what "degree" of control is required—a question that is not plainly answered by the Bankruptcy Code and to which we will turn shortly.

1. Governmental Control

A number of sources confirm the emphasis on governmental control. The legislative history report accompanying the 1978 Bankruptcy Act explained that the new act

> defines "governmental unit" in the broadest sense. . . . "Department, agency, or instrumentality" does not include entities that owe their existence to State action such as the granting of a charter or a license but that have no other connection with a State or local government or the Federal Government. The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function.

H.R. Rep. No. 95-595, at 311 (1977). This explanation is not entirely clear. There is some tension between requiring an "active" relationship and urging that the definition be read "in the broadest sense." *Id.* Nonetheless, control is inherent in the distinction between an "active" relationship and one characterized by merely granting a license.

Our decision in *River Region* likewise supports a focus on state control. We did not delve into the details of why River Region was not a state instrumentality. The district court decision that we affirmed, however, did, explaining that state instrumentalities, unlike CMHCs, are "entirely subject to governmental control." *In re River Region*, No. BK 78-00193-L, slip op. at 8.

Emphasizing control is consonant with tests imposed in related areas. The Internal Revenue Service has explained that "the degree of control that the federal or state government has" over an entity is "[o]ne of the most important factors" in determining whether it is a government instrumentality and so tax exempt. Rev. Rul. 89-49, 1989-1 C.B. 117; *see also* Rev. Rul. 57-128, 1957-1 C.B. 311 (listing public control and supervision as one of six factors to be considered). Similarly, we have explained that "[a]n entity is a political subdivision of a state if

it is a creation of the state, if its power to act rests entirely within the discretion of the state, and if it can be destroyed at the mere whim of the state." *Greater Heights Acad. v. Zelman*, 522 F.3d 678, 680 (6th Cir. 2008). Creation and destruction are exercises of control. In the context of the Foreign Sovereign Immunities Act, even while cautioning that government instrumentalities may have some "flexibility and independence from close political control," the Supreme Court explained that "[a] typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 624 (1983). The selection of a board and the passage of an enabling statute, like creation and destruction, are forms of governmental control.

Every lower court case on the instrumentality issue cited in this litigation turns in part on the presence or absence of some version of governmental control. *See In re N. Mar. I. Ret. Fund*, No. 12-00003, 2012 WL 8654317, at *2 (D. N. Mar. I. June 13, 2012) (holding that the Commonwealth's public retirement fund was not eligible to file under Chapter 11 in part because the government formed it, appointed its leaders, specified its duties, and provided its funding); *In re Hosp. Auth. of Charlton Cty.* (*United States v. Hosp. Auth. of Charlton Cty.*), No. 12-50305, 2012 WL 2905796, at *8 (Bankr. S.D. Ga. July 3, 2012) ("The Hospital Authority is subject to control by Charlton County because the County appoints the board of trustees and must authorize the Hospital Authority's dissolution."). *In re Las Vegas Monorail Co.*, upon which the bankruptcy court heavily relied, does so most explicitly, naming governmental control as one of three factors to be considered:

> The examination of the history of the Bankruptcy Code's use of municipality and instrumentality show[s] three distinct threads. The first thread focuses on whether the entity has any of the powers typically associated with sovereignty, such as eminent domain, the taxing power or sovereign immunity.
>
> If those powers are absent or only weakly present, then courts examine whether the entity has a public purpose. If so, the level of control exerted by the State (or its agreed agents) on the entity's activities in furtherance of that purpose is relevant; the more control over day-to-day activities, the more likely the entity is an instrumentality under Section 101(40).

The final thread analyzes the effect of the State's own designation and treatment of the entity.

429 B.R. 770, 788 (Bankr. D. Nev. 2010) (citations omitted). *Las Vegas Monorail* turned on whether the debtor was an instrumentality of a municipality (in that case, Las Vegas), rather than of a state (in this case, Kentucky). Nonetheless, that court performed a thorough and searching analysis of the history of municipal bankruptcy and of bankruptcy caselaw interpreting the term "instrumentality." *See id.* at 777–88. We take careful note of its synthesis of the components of an instrumentality, including its emphasis on control, but need not decide here whether to adopt that test in its entirety.

If a state government must have some control over its instrumentalities, the next question is what degree of control is necessary. While governmental control of an entity's day-to-day operations would certainly be sufficient to deem it a governmental instrumentality for purposes § 101(27), that granular level of control is not necessary here. *See Hosp. Auth.*, 2012 WL 2905796, at *8; *cf. Lebron v. Natl. R.R. Passenger Corp.*, 513 U.S. 374, 394–95 (1995); *First Nat'l City Bank*, 462 U.S. at 624–25. Precedent and practicality endorse review of a variety of factors, the totality of which determines whether the entity is subject to state control. Those factors include, but are not necessarily limited to, (1) whether the government created the entity, (2) whether the government appoints the entity's leadership, (3) whether an enabling statute guides or otherwise circumscribes the entity's actions, (4) whether and how the entity receives government funding, and (5) whether the government can destroy the entity. *See First Nat'l City Bank*, 462 U.S. at 624; *Greater Heights Acad.*, 522 F.3d at 680; *In re Las Vegas Monorail*, 429 B.R. at 798. Notably, the first four of these factors are virtually identical to those the Supreme Court used in *Department of Employment v. United States*, 385 U.S. 355 (1966), a case upon which the dissent relies. *See* Dissenting Op. at 33–36. In determining if Seven Counties is a "governmental unit" ineligible for Chapter 11 relief in bankruptcy, we begin with an evaluation of these factors.

First, Kentucky did not create Seven Counties. Private individuals incorporated Seven Counties as a nonprofit. As we have previously noted in a different context, that Kentucky recognizes a corporation as a CMHC after its incorporation does not mean that the entity was

created by the state. *See Ky. River Cmty. Care, Inc. v. NLRB*, 193 F.3d 444, 450 (6th Cir. 1999), *aff'd*, 532 U.S. 706 (2001) (concluding that a Kentucky CMHC is not a political subdivision for purposes of the National Labor Relations Act in part because recognition is not creation).

Second, Kentucky does not appoint Seven Counties' leadership, although it has the power to do so in emergency situations. The Board and Officers of Seven Counties are selected internally without input from the state government. The lone state official who attends some Seven Counties' board meetings, a governmental liaison, has no vote and is excluded from executive sessions. However, if the Secretary of the Cabinet for Health and Family Services finds that "an emergency situation exists with regard to the financial stability" of a CMHC, the Secretary may, upon giving the CMHC thirty days' notice, appoint a "caretaker administrator" for a CMHC and make other necessary "personnel changes." Ky. Rev. Stat. § 210.440(3)–(4).

Third, although Seven Counties is subject to governmental regulation and recognition, it does not function pursuant to an enabling statute. Kentucky statutes lay out a scheme for recognizing—and withdrawing recognition of—CMHCs as eligible to provide regional mental health services. *See id.* §§ 210.380, .440. To receive state funding for the provision of those services, each CMHC must annually submit a plan, budget, and description of the membership of its board. *See id.* § 210.430. Though this statutory scheme involves governmental oversight that bears some analogy to an enabling statute, being subject to regulation is not synonymous with functioning pursuant to an enabling statute. *See Williams v. Eastside Mental Health Ctr., Inc.*, 669 F.2d 671, 679 (11th Cir. 1982) (concluding that a heavily regulated CMHC was not a political subdivision of a state because state licensing regulations "are normal means by which states effectuate public policies through the regulation of private entities . . . [but] do not . . . somehow magically transform the fundamental nature of the licensed entity into a public agency or official"); *In re Las Vegas Monorail Co.*, 429 B.R. at 785 ("A limited measure of public control, regulation or oversight simply does not, by itself, make an entity a public agency. Otherwise, heavily regulated industries, such as casinos and taxi cabs, would be municipalities."). Moreover, unlike the traditional governmental agency whose actions may not exceed the bounds of its enabling statute, *see City of Arlington v. FCC*, 569 U.S. 290, 297–98

(2013), Seven Counties can and does undertake projects unrelated to its role as a regional provider of mental health services, such as entering contracts to staff state medical facilities.

Conditioning receipt of governmental funding on satisfaction of certain conditions is even less invasive. When identifying federal agencies and instrumentalities for purposes of the Freedom of Information Act, the Supreme Court held: "Grants of federal funds . . . [do not] serve to convert the acts of the recipient from private acts to governmental acts absent extensive, detailed, and virtually day-to-day supervision"—even if, as the dissent pointed out in that case, some measure of federal agency supervision is "a condition of the grant renewals." *Forsham v. Harris*, 445 U.S. 169, 180, 191 (1980); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (explaining, in the context of a First Amendment challenge, that "if a party objects to a condition on the receipt of [governmental] funding, its recourse is to decline the funds").

Fourth, Seven Counties receives 95% of its funding from three public sources: its contract with the Commonwealth of Kentucky to provide mental health services in the Louisville region to those unable to pay; its other contracts with the Commonwealth of Kentucky, including those that provide staffing in state-run facilities; and Medicaid reimbursements. Unlike direct appropriations (which neither Seven Counties nor any other CMHC receives), these types of funding sources are generally available to state and non-state entities alike. Even if we assumed that the bankruptcy court was incorrect to conclude that Seven Counties does not have a statutory right to request a special ad valorem tax to fund its programs, *see* Ky. Rev. Stat. § 210.480(1), requesting a tax is a far cry from assessing one, and Seven Counties has never taken even the limited step of making such a request.

And fifth, Kentucky cannot destroy Seven Counties, although the State could impair Seven Counties' ability to function. If certain named statutory preconditions (such as failing to comply with an approved service plan or state regulations) occur, the State may withdraw its recognition of a CMHC and thereby render it ineligible for the main service provision contract. *See* Ky. Rev. Stat. § 210.440(2). But Kentucky may not withdraw recognition of a CMHC at a "mere whim," *Greater Heights Acad.*, 522 F.3d at 680; the CMHC must take or fail to take certain actions listed in the statute to trigger these consequences. *See* Ky. Rev. Stat.

§ 210.440(2). And while withdrawal of recognition would create financial difficulties because that contract accounts for more than 20% of annual revenue, Seven Counties would not thereby cease to exist. *See Skills Dev. Servs., Inc. v. Donovan*, 728 F.2d 294, 300 (6th Cir. 1984) (concluding that nonprofit corporations that contracted with the State of Tennessee to provide services to the mentally disabled were not state instrumentalities for purposes of the Fair Labor Standards Act even though the contracts could be terminated at any time).

As this analysis makes clear, Seven Counties is an unusual entity. In the early 1960s, its predecessor began providing mental health services in Kentucky, and its evolution over the following decades included a filing for reorganization and then completion of bankruptcy in the late 1970s. These changes led to the present day Seven Counties, a unique entity with some features that might seem to belong to a state agency and others that would be entirely inconsistent with a governmental designation. Consideration of all factors involved, however, suggests that Seven Counties is not a governmental entity: The Commonwealth of Kentucky did not create Seven Counties, does not in the normal course of events choose its leadership, does not govern its operations through an enabling statute, does not fund it through a mechanism that is normally reserved for public entities, and cannot unilaterally destroy it. We therefore conclude that Seven Counties is not a state instrumentality.

### 2. Other Considerations

It does not follow from this analysis that governmental control is the only factor that could distinguish a private entity from a government instrumentality. A showing that Seven Counties possessed commonly recognized governmental attributes, for example, would give pause. But Seven Counties has not been shown to have any such attributes. There is no suggestion in the record that Seven Counties has the power of eminent domain. It cannot levy taxes. And while Seven Counties may have attempted to claim the defense of sovereign immunity in litigation, that claim has never been adjudged in its favor.

Likewise, we would hesitate to second-guess a state's classification of its own governmental entities. *See Tobkin v. Fla. Bar* (*In re Tobkin*), 578 F. App'x 962, 964 (11th Cir. 2014) (relying in part on Florida Supreme Court rules designating the bar association an agency

of that court to conclude that the bar association is a governmental unit); *In re Wade*, 948 F.2d 1122, 1124 (9th Cir. 1991) (same).  But the evidence that Kentucky makes such a claim as to CMHCs is not persuasive.  In a 1974 decision explaining why CMHCs should not be eligible to participate in KERS, Kentucky's highest court explained that "[t]he mental health-mental retardation corporations here involved are not claimed to be state agencies for any purpose other than retirement system participation." *Ky. Region Eight v. Commonwealth*, 507 S.W.2d 489, 491 (Ky. 1974).  The legislature responded in part by adding new statutory language affirming that any entity appropriately designated by the Governor for participation in KERS "shall be deemed to be a department, notwithstanding whether said body, entity, or instrumentality is an integral part of state government."  Ky. Rev. Stat. § 61.510(3).  That response confirmed CMHCs' statutory eligibility to participate in KERS, but did nothing to establish CMHCs as part of the state government.  To the contrary, the "notwithstanding" clause implicitly acknowledges that CMHCs like Seven Counties are not "an integral part of state government." *Id.*  Here, again, CMHCs' unusual nature is on display:  Kentucky statutes mention them, but do not explicitly claim them as governmental bodies.

KERS presents no persuasive evidence that the situation has changed in the intervening years.  KERS makes much of the legislature's recently added requirement that CMHC boards "[c]omply with the provisions" governing "special purpose governmental entities." *See id.* §§ 210.400(8), 65A.010–.090.**[5]**    But complying with regulations for special purpose governmental entities is not the same as *being* a special purpose governmental entity.  Even if it were, Seven Counties does not meet the statutory criteria, which require that a special purpose governmental entity have a governing body "with policy-making authority." *Id.* § 65A.010(9). The Board of Seven Counties is doubtless empowered by statute to oversee administration of mental health services. *See id.* § 210.400.  But overseeing and administering programs is not the same as making policy.  Using a roundabout and inscrutable designation such as this would be a perilously vague way for Kentucky to organize its governmental subsidiaries, and we decline to infer that it does.

---

**[5]**Those provisions merely require the regulated entities to, for example, submit audits and financial disclosures, Ky. Rev. Stat. §§ 65A.020–.040, follow certain registration and dissolution procedures, *id.* §§ 65A.050, .090, and adopt a code of ethics, *id.* § 65A.070.

We therefore conclude that Seven Counties is not an instrumentality of the Commonwealth of Kentucky under 11 U.S.C. § 101(27) despite the public purpose of its work. Because it is not a governmental unit, Seven Counties is eligible to file under Chapter 11.

**B. Certification**

We are next tasked with determining the legal nature of the relationship between Seven Counties and KERS. Seven Counties characterizes the relationship as a contractual one, such that, to the extent it is executory, it may be rejected in bankruptcy. *See* 11 U.S.C. § 365. KERS argues the relationship is purely statutory, in the nature of an assessment, such that it cannot be rejected under § 365 and must be faithfully maintained throughout the bankruptcy proceedings. *See* 28 U.S.C. § 959(b). Both sides present persuasive arguments.

KERS asks us to certify this issue to the Kentucky Supreme Court. Under Kentucky rules, federal courts may certify "questions of law of this state which may be determinative of the cause then pending before the originating court and as to which it appears to the party or the originating court that there is no controlling precedent" in state court decisions. Ky. R. Civ. P. 76.37(1). In other words, we may certify a question if (1) it presents a question of Kentucky law, (2) it is possibly determinative, and (3) there is no controlling precedent.

To the first point, deciding the nature of the relationship between KERS and Seven Counties requires interpreting both Kentucky statutes governing participation in KERS and Kentucky caselaw about the nature of a contract. In each circumstance, the key problem is one of Kentucky law. We do not understand this rule to forbid the certification of mixed questions of law and fact; the Kentucky Supreme Court has previously accepted the certification of questions that apply Kentucky law to facts. *See In re Beverly Hills Fire Litig.*, 672 S.W.2d 922, 922 (Ky. 1984).

Second, the Kentucky Supreme Court's decision on this issue "may be"—although will not necessarily be—determinative of almost all of this cause. To be clear, the "cause" is KERS's adversary proceeding, not the entirety of Seven Counties' bankruptcy filing. If the Kentucky Supreme Court determined that the relationship is statutory in nature, the relatively minor issue of whether that obligation must be faithfully maintained during the pendency of proceedings

under 28 U.S.C. § 959(b) would remain; Seven Counties' cross appeal (assuming for the sake of argument that it is properly presented in this proceeding) would also remain. But Seven Counties would be unable to reject its obligation to participate as an executory contract, which would resolve the core claim raised in KERS's adversary proceeding.

Third, and most important, we are not aware of any precedent from Kentucky courts that provides clear guidance in answering this question. There are a few decisions from Kentucky courts analyzing the statutes governing participation in KERS, *see, e.g.*, *Ky. Region Eight*, 507 S.W.2d at 491, some describing statutory assessments, *see, e.g.*, *Long Run Baptist Ass'n, Inc. v. Louisville & Jefferson County Metro. Sewer Dist.*, 775 S.W.2d 520 (Ky. Ct. App. 1989), and many more interpreting the elements of a contract, *see, e.g.*, *Energy Homes v. Peay*, 406 S.W.3d 828 (Ky. 2013). But we are aware of no state court decisions that should guide our choice as to which of these bodies of law to apply.

"The decision to certify a question to a state court 'lies within the sound discretion' of the federal courts, which 'generally will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks.'" *Smith v. Joy Techs., Inc.*, 828 F.3d 391, 397 (6th Cir. 2016) (quoting *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 449–50 (6th Cir. 2009)). The Supreme Court has long encouraged certification of issues that are "immensely important to a wide spectrum of state government activities." *Elkins v. Moreno*, 435 U.S. 647, 662 n.16 (1978). Though the decision on the issue in this case may resolve a historical problem relating only to this particular entity, it could nonetheless have a significant impact on the fiscal health of the Kentucky public pension system—and therefore on the retirement benefits of employees from every corner of state government.

The final resolution of this case, however, does turn on the proper interpretation of several federal laws—not only the meaning of "instrumentality" in the Bankruptcy Code, but also what makes a contract "executory" under 11 U.S.C. § 365, what statutory obligations must be fulfilled during bankruptcy proceedings under 28 U.S.C. § 959(b), and, assuming Seven Counties' cross appeal is properly before us, the characteristics of a "governmental plan" under the Employee Retirement Income Security Act, *see* 29 U.S.C. § 1002(32), and federal tax law, *see* 26 U.S.C. § 414(d). We have already passed on the first of those questions. The remaining

questions are properly reserved, as what we answer and how will depend on the Kentucky Supreme Court's determination. Reservation avoids the issuance of an opinion that might well prove to be advisory.

> We therefore certify to the Kentucky Supreme Court the following question:
>
> Whether Seven Counties Services, Inc.'s participation as a department in and its contributions to the Kentucky Employees Retirement System are based on a contractual or a statutory obligation.

We hold this appeal in abeyance pending the Kentucky Supreme Court's decision. *See In re Motors Liquidation Co.* (*Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A.*), 777 F.3d 100, 103 (2d Cir. 2015).

## III. CONCLUSION

We conclude that because the Commonwealth of Kentucky does not exercise the requisite degree of control over Seven Counties, Seven Counties is not a state instrumentality within the meaning of the Bankruptcy Code. We therefore **AFFIRM** the district court's decision that Seven Counties is eligible to file under Chapter 11. But lacking state court precedent characterizing the nature of the relationship between Seven Counties and KERS, we **CERTIFY** that question to the Kentucky Supreme Court.

———————————

**DISSENT**

———————————

DAVID W. McKEAGUE, Circuit Judge, dissenting.  The majority is right that "[n]either this court nor any of our sister circuits have developed a test to determine whether an entity is a state instrumentality within the meaning of § 101(27)" of the Bankruptcy Code.  Op. at 7.  But instead of developing a clear test to fill the void, the majority relies on a single factor predominantly derived from a Nevada bankruptcy court's test—that it then purports not to adopt—to hold that Seven Counties is not an instrumentality.  In doing so, the majority misapprehends several provisions of Kentucky's statutory regime governing entities like Seven Counties, likely leading it to an erroneous result even under its own approach.  Because I cannot agree with the reasoning the majority uses or the result it reaches, I respectfully dissent.

I begin by noting that congressional acquiescence to longstanding precedent mandates a broad definition of "instrumentality" in the bankruptcy context because of state sovereignty interests.  From there, using an ordinary-meaning framework, I conclude that Seven Counties easily qualifies as an instrumentality of Kentucky.  I then answer the primary objection to an ordinary-meaning definition—that such a definition casts too broad a net—noting that the Supreme Court has already held entities like the Red Cross and Amtrak are instrumentalities in analogous contexts and concluding that Seven Counties would so qualify.

**I**

The term "governmental unit" was introduced into law in the 1978 Bankruptcy Code.  *See* Pub. L. No. 95-598, 92 Stat. 2549 (1978).  The Code casts a broad net with this term.  A "governmental unit" includes: "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States . . . , a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government."  11 U.S.C. § 101(27).  But before I explore the definition of "instrumentality"—the most relevant subset of "governmental unit" in this case—I examine *why*

Congress sought to "define[] 'governmental unit' in the broadest sense."  H.R. Rep. 95-595, at 311 (1977).

## A

A "governmental unit" is not a "person," *see* 11 U.S.C. § 101(41), and therefore may not seek bankruptcy under Chapter 11.  These units must instead seek bankruptcy protection under the more rigorous requirements detailed in Chapter 9.  *See* 11 U.S.C. §§ 101(40), 903.  In order to file under Chapter 9, a "political subdivision agency or instrumentality of a State," 11 U.S.C. § 101(40), must be "specifically authorized, in its capacity as a municipality or by name, to be debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter."  11 U.S.C. § 109(c)(2).[1] Why has Congress gone to such lengths to define "governmental unit" in the "broadest sense"? Why does Chapter 9 ensure the States retain control over their political subdivisions, agencies, and instrumentalities?

The answer is simple: state sovereignty.

Prior to 1936, federal bankruptcy law had permitted instrumentalities like Seven Counties to file for bankruptcy without state consent.  The Supreme Court put a stop to it: "If the obligations of states or their political subdivisions may be subjected to the interference [bankruptcy law creates]," the Court wrote, "they are no longer free to manage their own affairs . . . . And really the sovereignty of the state, so often declared necessary to the federal system, does not exist." *Ashton v. Cameron Cty. Water Improvement Dist.*, 298 U.S. 513, 530 (1936); *see also* Adam Feibelman, *Involuntary Bankruptcy for American States*, 7 Duke J. Const. L. & Pub. Pol. 80, 106 (2012) (noting "there is a constitutional limit on the scope of any bankruptcy regime that extends to state governmental units").

---

[1]"The degree to which state laws permit Chapter 9 filings varies from state to state.  Twelve states specifically authorize Chapter 9 filings, while 12 others permit bankruptcy filings given a further action to be taken by a state, official, or other entity.  In addition, three other states authorize a limited subset of municipalities to file for bankruptcy.  The remaining 23 states do not authorize municipal bankruptcy filings." Kenneth E. Noble & Kevin M. Baum, *Municipal Bankruptcies:  An Overview and Recent History of Chapter 9 of the Bankruptcy Code*, 9 Pratt's J. Bankr. L. 513, 514 (2013).

After *Ashton*, Congress amended the regime to ensure states retained ultimate control. The Supreme Court upheld the plan. *See United States v. Bekins*, 304 U.S. 27, 51–52 (1938) (holding a subsequent voluntary bankruptcy regime constitutional because "[t]he statute is carefully drawn so as not to impinge upon the sovereignty of the State" and "[t]he bankruptcy power is exercised . . . only in a case where the . . . plan of composition approved by the bankruptcy court is authorized by state law").

In our latest bankruptcy regime, Congress has continued to adhere to *Ashton*. Congress has defined "governmental unit" in the "broadest sense," *see* H.R. Rep. 95-595, at 311 (1977), and allowed a state to restrict bankruptcy with respect to its instrumentalities, *see* 11 U.S.C. § 903. This constitutional concern for state sovereignty should be at its apex in this case, where an entity with a statutory status—birthed from a statutory regime that also compels it to participate in a state's own retirement fund—seeks to invoke the federal Bankruptcy Code to avoid its statutory obligations.

If Seven Counties is not an instrumentality, and thus remains eligible for Chapter 11 protection, then we must accept wide-ranging implications. This case provides but one striking example: Seven Counties wants to use Chapter 11 to walk away from its solemn state statutory obligations, leaving Kentucky and its own retirement system holding the bag. One could imagine other perverse results. Chapter 11 also allows for *involuntary* bankruptcy. Could private creditors use a federal code provision to force an entity such as Seven Counties to go bankrupt without regard to its statutory obligations to Kentucky's retirement fund? Potentially *yes*, under the majority's approach. *See* 11 U.S.C. § 303(b)(1).

Any definition of "instrumentality" in the Bankruptcy Code, particularly one developed in a case of this magnitude, should honor history and consider whether its application might interfere with state sovereignty.

**B**

As the majority notes, the term "instrumentality" is not directly defined. "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012) (relying on dictionary definitions at the time of a statute's

enactment to construct the "ordinary" definition of "interpreter").  At the time of enactment, an instrumentality was commonly defined as "something by which an end is achieved" or "something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out."  *Webster's New Int'l Dictionary* 1172 (3d ed. 1976).[2]

An entity like Seven Counties is an instrumentality, therefore, if it "serves as an intermediary or agent through which one or more [traditional government] functions of a controlling [state or municipality] are carried out."  *Id.*  From this definition, I distill three elements:

> (1) a state or its municipality creates or designates an intermediary or agent;
>
> (2) the intermediary or agent carries out one or more traditional government functions; and
>
> (3) the state or its municipality retains a degree of sovereign control over the intermediary's or agent's existence or designation and its exercise of one or more traditional government functions.

These elements together accord with ordinary meaning and honor congressional intent to construe this term in the "broadest sense" to protect state sovereignty.  I will now examine how Seven Counties fits within these elements.

**(1)**

Prior to 1964, public mental health and intellectual disability services were provided directly by the Commonwealth through its Department of Mental Health.  In response to the Mental Retardation Facilities and Community Mental Health Centers Construction Act, Pub. L. No. 88-164, 77 Stat. 282 (1963), Kentucky formed community mental health centers (CMHCs) across the Commonwealth.

As a successor to an original CMHC, Seven Counties derives its authority to administer its programs and services within its designated, seven-county region from an Act of the Legislature.  *See* Ky. Rev. Stat. § 210.380.  Even though corporate in form, Seven Counties faces

---

[2]Black's Law Dictionary similarly defines "[a]n instrumentality . . . as either '[a] thing used to achieve an end or purpose' or '[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body.'"  *Black's Law Dictionary* (10th ed. 2014).  This definition focuses on "use" and not "control," suggesting that "control" in its absolutist form is not found in ordinary meaning.

mandatory governance from its board, which is made up with community stakeholders, including relevant government officers.  *See id.*

Seven Counties is a single agency—*the* single agency—fully tasked by the Commonwealth to provide mental-health services to a seven-county area.  Seven Counties' services are provided under the direction of the Department of Behavioral Health, Developmental and Intellectual Disabilities (DBHDID) within the Cabinet for Health and Family Services (CHFS).[3]  The regional mental health boards, including Seven Counties, are CHFS' "behavioral health providers," "the primary providers for mental health care services for the State."  Seven Counties, along with the other boards, are the "arms and legs for the provision of [the behavioral health] services."  Moreover, Seven Counties receives over 95% of its revenue from and through the Commonwealth, and the remainder originates at the federal level.

In short, Seven Counties holds a special status under Kentucky law, and other features of the regime in which it operates confirm its instrumental status.

The majority makes much of the fact that "private individuals incorporated Seven Counties as a nonprofit."  Op. at 12.  However, an entity's corporate status has never mattered much.  In *McCulloch v. Maryland*, 4 Wheat. 316, 325–26 (1819), for example, the Supreme Court noted corporations "are common means, such as all governments use."  In another context, the Court held that Amtrak—notwithstanding its corporate status—is a federal instrumentality for constitutional purposes:

> A remarkable feature of the heyday of those corporations, in the 1930's and 1940's, was that, even while they were praised for their status "as agencies separate and distinct, administratively and financially and legally, from the government itself, [which] has facilitated their adoption of commercial methods of accounting and financing, avoidance of political controls, and utilization of regular procedures of business management," it was fully acknowledged that they were a "device" of "government," and constituted "federal corporate agencies" apart from "regular government departments."

---

[3]Under Ky. Rev. Stat. § 194A.010, CHFS is "charged with basically overseeing the health and human service delivery system for the State of Kentucky."  CHFS has eleven departments, one of which is the DBHDID— "the primary agency that oversees the State's . . . developmental disability facilities" and "contracts with the community mental health centers throughout the State."

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 394 (1995); *see infra* Part II.  True, Kentucky did not "create" Seven Counties in its original form—and instead chose to "designate" Seven Counties as its intermediary—but historically that has not mattered either.  *Cf. Pennsylvania v. Bd. of Directors of City Trusts of Philadelphia*, 353 U.S. 230 (1957) (per curiam) (holding that Girard College was a government actor for constitutional purposes even though it "had been built and maintained pursuant to a privately erected trust").  Furthermore, when Kentucky designated Seven Counties as the exclusive program administrator for state-provided mental and behavioral health in its seven-county area, Seven Counties' status transformed into an entity quite distinct from a mine-run corporation.  *See* Ky. Rev. Stat. § 210.380; *see also* Ky. Rev. Stat. § 61.510(3).

**(2)**

Seven Counties exists at its core to provide for the *salus populi*, or people's welfare, and exercises what historically has been a government function across the nation since the Nineteenth Century.  *See generally* William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth-Century America* (1996); *see also, e.g.*, *Bd. of Supervisors of La Salle Cty. v. Town of South Ottawa*, 12 Ill. 480 (Ill. 1851) (quoting Art. XVI, § 13 of Act of Apr. 16, 1849) ("It shall be the duty of the board of supervisors to take charge of the poor, and the management of the poor-houses in their respective counties . . . .").

The Community Mental Health Act of 1963 was designed to assist individuals with mental illnesses and disabilities "who were 'warehoused' in hospitals and institutions," providing avenues for them to "move back into their communities."  Nat'l Council for Behavioral Health, "Community Mental Health Act," https://www.thenationalcouncil.org/about/national-mental-health-association/overview/community-mental-health-act/ (last accessed July 11, 2018).  Consistent with the Act's goals, Kentucky provided for monopolistic community boards that would operate within defined areas and would receive almost all funding from or through the Commonwealth.  *See* Ky. Rev. Stat. § 210.380.  Rather than provide care directly, as it had done for decades, Kentucky decided to provide mental health services through intermediaries.  But this shift from institutionalized to community-based care did not signal a retreat from what has remained a core part of the *salus populi* for over a century.  Even if its motives had once been

malevolent or its care substandard, government has long directly assumed care for those in need of mental and behavioral health services.

From its inception, through its "community mental health board[]," Seven Counties has "provide[d] regional community mental health-mental retardation services" to fulfill the State's responsibility to the less fortunate. Executive Order 69-667; Seven Counties "is the administrator of such a program," Ky. Rev. Stat. § 210.380, and therefore "carries out one or more traditional government functions."

**(3)**

Finally, Kentucky unquestionably "retains a degree of sovereign control over [Seven Counties'] existence and its exercise of one or more traditional government functions." Seven Counties retains a basket of statutory rights and responsibilities that demonstrates that Kentucky retains a degree of state control over Seven Counties' designation as program administrator and its exercise of government-provided care. Kentucky's statutory scheme provides entities like Seven Counties with special oversight from community-based boards, which must include local government stakeholders. *See* Ky. Rev. Stat. § 210.480. These boards may, indeed *shall*, request a special ad valorem tax if the programs they oversee are underfunded. *See id.* Entities like Seven Counties must "submit annually to the secretary of Cabinet for Health and Human Services its plan, budget, and membership of the board for the next fiscal year." *Id.* § 210.430. "No program shall be eligible for a state grant and other fund allocations from the Cabinet . . . hereunder unless its plan and budget have been approved by the secretary," and "no program shall be eligible . . . unless the board composition is reasonably representative of those [community] groups enumerated in Ky. Rev. Stat. § 210.380." *Id.* § 210.430.

In addition, the Commonwealth can exercise a degree of control over Seven Counties in a way that it could only do for one of its instrumentalities. Crucially, and most relevant to the "control" element, if Seven Counties fails to fulfill its (government) functions, CHFS has the authority to appoint a caretaker to operate and administer the programs and to make personnel changes necessary to ensure Seven Counties' continued operations in compliance with its plan and budget and CHFS' requirements. *See* Ky. Rev. Stat. § 210.440(3)–(4).

And in the same vein that Seven Counties owes its very status to Kentucky law, *see* Ky. Rev. Stat. § 210.380—what the government can giveth, it can taketh away, *see id.* § 210.440(2). CHFS can withdraw its recognition of Seven Counties as the designated program administrator for its area. *See id.* § 210.440(2), (3)(a), (4). If Seven Counties had no statutory status apart from any private corporation under Kentucky law, how could that possibly be so? While the Commonwealth could not necessarily "destroy" Seven Counties' status as a nonprofit corporation for *all* purposes, it certainly has the power to destroy its instrumental status that births its very name—its status as the sole direct provisioner of community-based mental health care in a seven-county area under Kentucky law.

To be sure, Kentucky does not exercise "day-to-day" control over Seven Counties. However, neither does it exercise "day-to-day" control over its municipalities. Kentucky's commitment to subsidiarity (or local control) does not mean that it has abandoned solidarity with those whom receive its direct aid. An instrumentality can, of course, "control[] its own day-to-day operations." *See In re Hosp. Auth. of Charlton Cty.*, 2012 WL 2905796, at *8 (S.D. Ga. July 3, 2012).

Yet the majority seems to require just that—it constructs several factors that only serve to fuel its heightened "government control" test. In doing so, the majority misapprehends several provisions in the relevant statute. I briefly consider three of its worst mistakes.

*Enabling Statute.* First, the majority finds that Seven Counties "does not function pursuant to an enabling statute." An "enabling statute" is a law that "creates new powers," particularly one that "confer[s] powers" on an instrumentality "to carry out various delegated tasks." *Black's Law Dictionary* (10th ed. 2014). The majority is clearly wrong. Seven Counties certainly functions pursuant to an enabling statute:

> **Any combination of cities or counties** of over fifty thousand (50,000) population, and upon the consent of the secretary of the Cabinet for Health and Family Services, any combination of cities or counties with less than fifty thousand (50,000) population, **may establish a regional community services program for mental health or individuals with an intellectual disability** and staff same with persons specially trained in psychiatry and related fields. **Such programs and clinics may be administered by a community board for mental**

**health or individuals with an intellectual disability established pursuant to KRS 210.370 to 210.460, or by a nonprofit corporation.**

Ky. Rev. Stat. § 210.370 (emphasis added). While the disjunctive "or" suggests that a "nonprofit corporation" is itself distinct from a "community board," the very next section clarifies:

Every combination of cities and counties establishing a regional community services program for mental health or individuals with an intellectual disability shall, before it comes within the provisions of KRS 210.370 to 210.460, establish a community board for mental health or individuals with an intellectual disability consisting of at least nine (9) members. **When a nonprofit corporation is the administrator of such a program not established by a combination of either cities or counties, such corporation shall select a community board for mental health or individuals with an intellectual disability which shall be representative of the groups herein enumerated, but the number of members need not be nine (9).**

Ky. Rev. Stat. § 210.380 (emphasis added).

In other words, a nonprofit corporation also must "select a community board for mental health or individuals with an intellectual disability." *See id.*[4] And the nonprofit corporation's "community board" must "be representative" of the same "groups" of community stakeholders, including "elected chief executives of county governments," "county welfare boards," and so on, as a county-run program. *See* Ky. Rev. Stat. § 210.380. Hence, Seven Counties derives its authority to "administer" the government program within its designated area from—and remains politically accountable to—its seven counties under Ky. Rev. Stat. § 210.380. *See id.* In the face of these statutory provisions, the majority's finding that Seven Counties, through its board, "does not function pursuant to an enabling statute" is baffling. Op. at 12. No one disputes that "being subject to regulation is not synonymous with functioning pursuant to an enabling statute." *Id.* at 13. But the statutory scheme in this case demonstrates that Kentucky treats CMHCs as far more than mere "subject[s] to regulation." *Id.* Indeed, the statutory text quite literally enables them to "to *carry out* various delegated tasks," *Black's Law Dictionary* (10th ed. 2014) (emphasis

---

[4]The statute gives no indication that a county-run program's "community board for mental health or individuals with an intellectual disability," *see* Ky. Rev. Stat. § 210.370, should be treated *any* differently than a nonprofit corporation's "community board for mental health or individuals with an intellectual disability," *see id.* § 210.380. Thus, we must apply "[the] presumption that a given term is used to mean the same thing throughout a statute." *Brown v. Gardner*, 513 U.S. 115, 118 (1994).

added).  *See* Ky. Rev. Stat. § 210.380 (authorizing local government units to "establish a regional community services program for mental health or individuals with an intellectual disability and staff same with persons specially trained in psychiatry and related fields").

*Ad Valorem Tax Power.*    Second, the majority attempts to excuse the bankruptcy court's conclusion that Seven Counties "does not have a statutory right to request a special ad valorem tax to fund [its] programs."  Op. at 14.  But this is just not so.  Crucially, the statutory section that creates taxing districts gives no indication that it excludes areas where programs are administered by nonprofit corporations.  Rather, the text expressly states that "[t]he members of the community board for mental health or individuals with an intellectual disability recognized by the secretary for health and family services pursuant to Ky. Rev. Stat. § 210.380 shall, by virtue of their office, constitute and be the governing board of the taxing district."  *Id.* § 210.470(3).  This section cites § 210.380, which brings us full circle back to the very section that establishes that even programs administered by *nonprofit corporations* must have "a community board for mental health or individuals with an intellectual disability."  *Id.* § 210.380.

It's not just that the plain statutory text clearly refutes the bankruptcy court's position. History teaches and the record below demonstrates that these nonprofit corporations can request and *have requested* imposition of an ad valorem tax.  Actually, the statute places a *duty* on each board—overseeing a nonprofit corporation or not—to request imposition of such a tax if funding so requires.

> **If**, after the establishment of the taxing district for mental health or individuals with an intellectual disability as provided for in this section, KRS 210.460, and KRS 210.470, **the tax levying authorities in member areas of the district, in the opinion of the community board for mental health or individuals with an intellectual disability, do not appropriate an amount sufficient to meet the needs of the services program for mental health or individuals with an intellectual disability and clinic**, as established pursuant to KRS 210.370, **the community board for mental health or individuals with an intellectual disability, acting as the governing body of the taxing district shall, with the approval of the Cabinet for Health and Family Services, request the fiscal courts in each of the member areas which have not contributed a sufficient proportionate share of the cost of the program, to impose a special ad valorem tax** for mental health or individuals with an intellectual disability in such amount that it deems sufficient, but not in excess of four cents ($0.04) per one hundred dollars ($100) of full assessed valuation.

Ky. Rev. Stat. § 210.480(1) (emphasis added).

Kentucky's statutory scheme does not say it requires only "community boards" established by cities or counties (none of which even exist) to perform the duties listed therein— and how could it?  "[E]ach community board for mental health or individuals with an intellectual disability"—whether it governs a nonprofit corporation or county-run system—is subject to the same duties.  *See* Ky. Rev. Stat. § 210.400.  The statute requires all boards to perform those duties, for "ad valorem tax" purposes and otherwise.  *Id.* § 210.480.

The majority protests that "requesting a tax is a far cry from assessing one, and Seven Counties has never taken even the limited step of making such a request."  Op. at 14.  But this observation tells us nothing about Kentucky's treatment of its own CMHCs as instrumentalities, as evidenced by these types of special statutory powers and duties.  If a city eliminated taxes and operated on grants instead, it would neither shed its instrumental status nor its ability to request higher taxes again from its constituents.

*Statutory Classification.*  In addition to its muddled attempt to strip Seven Counties of its statutory powers and duties, the majority casually disregards Seven Counties' statutory classification.  In the process, it enables a federal bankruptcy judge to disregard Kentucky's own determination that entities like Seven Counties are "deemed to be a department, notwithstanding whether said body, entity, or instrumentality is an integral part of state government."  Ky. Rev. Stat. § 61.510(3).  The majority is right to note that this statutory amendment was passed in response to a Kentucky Supreme Court decision and to ensure these entities were eligible to participate in KERS.  But the majority draws a completely illogical conclusion from the statutory language: "[Seven Counties] shall be deemed to be a department, notwithstanding whether [it] is an integral part of state government" somehow equals an "implicit[] acknowledge[ment] . . . that Seven Counties [is] not 'an integral part of state government.'"  The majority then compounds its error by failing to explain why Kentucky's own statutory classification deserves no weight.  *See* Op. at 16.

The majority also discredits another, more recent statutory amendment that provides that entities like Seven Counties, through their community boards, must "comply with provisions"

governing "special purpose governmental entities," *see* Ky. Rev. Stat. §§ 210.400(8), 65A.010–.090.  Op. at 16.  The majority announces that "complying" with the same regulations is not the same as "being" a special purpose entity.  *Id.*  As evidence for this proposition, the majority declares—without any analysis—that Seven Counties "does not meet the statutory criteria."  *Id.* In fact, the opposite is true.  Seven Counties is a "special purpose governmental entity" because it: (1) "[e]xercises less than statewide jurisdiction"; (2) "exists for the purpose of providing one . . . or a limited number of services or functions" (namely, "public mental health," *id.* § 65A.010(c)(5)); (3) "[i]s governed by a board . . . with policy-making authority that is separate from the state and the governing body of the . . . cities and counties . . . in which it operates"; and (4) "[m]ay receive and expend public funds . . . from the state, from any agency, or authority of the state, from a city or county, or from any other special purpose governmental entity."  *Id.* § 65A.010(9)(a).

Yet the majority asserts that Seven Counties' governing board does not have "policy-making authority."  This flatly contradicts statutory sections that command Seven Counties to, among other things: "[a]ct as the administrative authority" for and "oversee and be responsible for [its] management"; "[a]dopt and implement policies to stimulate effective community relations"; "[p]romote, arrange, and implement working agreements with other social service agencies"; and "[c]omply with [all] provisions" that govern "boards with policy-making authority."  *Id.* §§ 210.400(3), (4), (7), (8).  Considering this mountain of evidence, it defies logic to say that we cannot even "infer" that Seven Counties is a "special purpose governmental entit[y]."  Op. at 17.  If anything, we can infer just that—that Kentucky *clarified* through statutory amendment that entities like Seven Counties and its board must indeed operate as a "special purpose governmental entity."  *See* Ky. Rev. Stat. §§ 210.400(8), 65A.010–.090.

While I cannot say for certain that the majority would have changed its position if it had interpreted these relevant provisions correctly, I suspect that Seven Counties is an instrumentality even under the majority's approach.  Unfortunately, the majority's interpretive gymnastics come with a heavy price—a severe intrusion into Kentucky's sovereignty.  Under Chapter 9, Kentucky retains the sovereign right to prevent Seven Counties from filing for

bankruptcy.  *See supra* Part I.A.  The majority constructively, really *destructively*, denies Kentucky that right.

*****

In sum, Kentucky "retains a degree of sovereign control over [Seven Counties'] existence and its exercise of one or more traditional governmental functions"; and together with the first two elements, Seven Counties meets the ordinary-meaning definition of a "governmental unit," or "instrumentality," under § 101(41) of the Bankruptcy Code.  Having attempted to respect state sovereignty, explain how Seven Counties is an instrumentality, and illustrate how the majority misapprehends Kentucky's statutory regime even under its own approach, I will now turn to the primary objection to an ordinary-meaning approach.

## II

The majority does not exactly explain why it deviates from instrumentality's ordinary meaning.  *See Taniguchi*, 566 U.S. at 566.  But its heavy reliance on a muscular "state control" test developed by *Las Vegas Monorail* (and adopted by the court below) is instructive.[5]

The primary objection to an ordinary-meaning framework is that it casts too broad a net. If we were to follow an ordinary-meaning approach, the thinking goes, any contractor that repairs public roads or nonprofit that provides services in low-income communities would also be an instrumentality of the state.  This would, of course, be contrary to established practice because nonprofits and government contractors can and do file for bankruptcy under Chapter 11. *See, e.g.*, *P.R. Highway & Transp. Auth. v. Redondo Constr. Corp. (In re Redondo Constr. Corp.)*, 820 F.3d 460 (1st Cir. 2016) (Chapter 11 proceedings of a construction contractor);

---

[5]The majority attempts to mask its heavy reliance on the *Las Vegas Monorail* test by adding citations to *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) and *Greater Heights Acad. v. Zelman*, 522 F.3d 678 (6th Cir. 2008).  The former case addressed a very different context—an instrumentality's liability in the context of a superseded version of the Foreign Sovereign Immunities Act—and cuts against the majority's position in numerous ways.  For example, the majority makes hay out of the fact that Seven Counties does not receive "direct appropriations."  But in *First National City Bank*, the Supreme Court noted that "an instrumentality is primarily responsible for its own finances."  462 U.S. at 624.  Moreover, "[t]he instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply."  *Id.*  The latter case only underscores the importance of honoring a state's sovereignty over its political subdivisions (and instrumentalities).  *See Greater Heights Acad.*, 522 F.3d at 680.

*Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143 (5th Cir. 2015) (Chapter 11 proceedings of a nonprofit low-income housing developer)).   The underlying concern also appears to echo a variant of the absurdity canon—that this approach would render "entities like the Red Cross" instrumentalities under the Bankruptcy Code and that result is somehow absurd, or at least undesirable. *Ky. Emps. Ret. Sys. v. Seven Counties Servs., Inc.*, 550 B.R. 741, 758 (W.D. Ky. 2016) (citing *Las Vegas Monorail*, 429 B.R. at 789).[6]   Therefore, courts—including the majority today, *see* Op. at 10–11—have sought to cabin this perceived problem by developing a "state control" litmus test above and beyond what ordinary meaning permits. *See, e.g.*, *Las Vegas Monorail*, 429 B.R. at 789.

That objection *should* carry little force because "courts must presume that a legislature says in a statute what it means and means in a statute what it says," *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461–62 (2002), and "[w]hen a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi*, 566 U.S. at 566; *see also Barnhart*, 534 U.S. at 462 ("When the words of a statute are unambiguous . . . judicial inquiry is complete." (internal citation and quotation marks omitted)).

But, in any event, this objection is misguided.   For one, an ordinary-meaning definition is not overly broad.   An ordinary-meaning test satisfies the concerns regarding these and other cases, and many examples are simply floats in a parade of horribles.   Second, even if the ordinary-meaning definition seems overly broad, the Supreme Court has held in an analogous context that the most-referenced float—the Red Cross—*is* an instrumentality.

## A

I first note that an ordinary-meaning definition is not overly broad—it would not, for example, encompass any government contractor.   A private construction company for which the government contracts to "work[s] on three construction projects," *In re Redondo Const. Corp.*, 820 F.3d at 462, fails the plain-meaning test.   The company was not an agency "through which a

---

[6]Seven Counties reiterates this concern on appeal. *See* Appellee's Br. at 31 (noting the possibility that "innumerable entities such as the Red Cross or United Way could be labeled instrumentalities, which all agree they are not").   I disagree that a broad definition is undesirable, let alone absurd, because entities like Seven Counties could simply seek to file under Chapter 9, which of course respects state sovereignty.

*function* of [the government] [wa]s accomplished," because the government is not in the construction business.  Sure, the government provides functioning infrastructure, but historically it has not built its own bridges.  *See, e.g.*, *Proprietors of the Charles River Bridge v. Proprietors of the Warren Bridge*, 11 Pet. 420 (1837).  Moreover, the government generally neither designates construction companies as intermediaries nor retains a degree of sovereign control over their affairs.

Likewise, a low-income housing developer, *see Templeton*, 785 F.3d at 145, is not an agency "through which a *function* of [the government] is accomplished," because the government is not in the housing development business.  Sure, government provides monetary support to tenants for housing, along with other tax benefits and grants to ensure its tenants have housing to use that support, but historically (with very few exceptions) it has not built its own.  Moreover, the government neither designates low-income housing developers as intermediaries nor retains a degree of sovereign control over their affairs.

A designated public health agency, such as Seven Counties, differs in important respects from a construction contractor or a housing developer.  The history and purposes of, and funding for, these services show that Seven Counties serves as an intermediary through which Kentucky's mental-health services are carried out.  These services have been directly provisioned by government since the Nineteenth Century.  *See supra* Part I.B.2.  Moreover, the statutory authority and regime in which Seven Counties exists is one where the state retains ultimate control.  *See supra* Part I.B.3.  In short, a distinction exists between the government *contracting with* construction companies to build a road or *providing incentives to* housing developers and *designating* a health agency to directly *carry out* traditional government functions.

**B**

Even if I shared the concern that an ordinary-meaning definition casts too broad a net, the Supreme Court has already endorsed a broad definition in an analogous context.

As I alluded to earlier, the Red Cross is prominently referenced in the case most heavily relied on by the court below for the so-called "state control" test.  *See In re Las Vegas Monorail*,

429 B.R. 770, 789 (Bankr. D. Nev. 2010) ("This inquiry is necessary because many entities have public functions—the Red Cross and other charities come to mind—but are not instrumentalities of the State because of the lack of any State process to control their activities."). In fact, in 1966, the Supreme Court held that the Red Cross *is* an instrumentality of the United States, and thus enjoyed constitutional immunity from state taxes.

> On the merits, we hold that the Red Cross is an instrumentality of the United States for purposes of immunity from state taxation levied on its operations, and that this immunity has not been waived by congressional enactment. Although there is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality, the Red Cross is clearly such an instrumentality.

*Dep't of Emp. v. United States*, 385 U.S. 355 (1966) (citing Wesley A. Sturges, *The Legal Status of the Red Cross*, 56 Mich. L. Rev. 1 (1957)). For purposes of immunity from state taxation, the Supreme Court seemingly used a plain-meaning conception of "instrumentality." *See id.* at 358–60. The Court did not articulate a clear definition, but nevertheless held that the Red Cross was "clearly such an instrumentality" by examining six factors.

A closer examination of those factors, which largely track the three elements derived from ordinary meaning, *see supra* Part I, reveals that Seven Counties is an instrumentality of Kentucky.

**(1)**

The Supreme Court first observed that "Congress chartered the present Red Cross in 1905, subjecting it to governmental supervision and to a regular financial audit by the Defense, then War, Department." *Dep't of Emp.*, 385 U.S. at 359. Similar to the Red Cross, Seven Counties derives its authority to administer its programs and services within its designated seven-county region from an Act of the Legislature. *See* Ky. Rev. Stat. § 210.380. The "arms and legs for the provision of [Kentucky's behavioral health] services," Seven Counties must ultimately answer to the Commonwealth. Kentucky retains the authority to appoint a caretaker to operate and administer the programs and to make personnel changes necessary to ensure Seven Counties' continued operations in compliance with its plan and budget and CHFS

requirements. *See id.* § 210.440. Kentucky can quite literally withdraw Seven Counties from its seven counties.

## (2)

The second factor that the Supreme Court relied upon was that "[the Red Cross's] principal officer is appointed by the President, who also appoints seven (all government officers) of the remaining 49 Governors." *Dep't of Emp.*, 385 U.S. at 359. While Kentucky does not directly appoint Seven Counties' leadership, the Commonwealth has the power to appoint a caretaker in its place.[7] In addition, consistent with Ky. Rev. Stat. § 194A.010, an executive agency oversees Seven Counties. Finally, Seven Counties' governing board is made up of the same groups of community stakeholders as any other county-run provider. *See* Ky. Rev. Stat. § 210.380. The Board must be made up of some government officers in the same manner as the Red Cross. *See id.*

## (3)

As a third factor, the Supreme Court noted that "[b]y statute and Executive Order . . . the Red Cross [has] the right and obligation to meet this Nation's commitments under the various Geneva Conventions, to perform a wide variety of functions indispensable to the workings of our Armed Forces around the globe, and to assist the Federal Government in providing disaster assistance to the States in time of need." *Dep't of Emp.*, 385 U.S. at 359. Like the Red Cross, Seven Counties exercises what historically has been a government function since the Nineteenth Century. *See supra* Part I.B.2. Seven Counties has statutory duties unique to state intermediaries that administer care and arise from Kentucky law. *See, e.g.*, Ky. Rev. Stat. § 210.380.

## (4)

Fourth, the Supreme Court noted that "[a]lthough its operations are financed primarily from voluntary private contributions, the Red Cross does receive substantial material assistance

---

[7]Moreover, executives for many instrumentalities and nearly all municipalities are not appointed by a president or governor.

from the Federal Government." *Dep't of Emp.*, 385 U.S. at 359. In this respect, Seven Counties is even more of an instrumentality than the Red Cross. Under Kentucky law, Seven Counties' services are provided under the direction of the CHFS. A substantial portion of Seven Counties' revenue originates through the Commonwealth, and the remainder originates at the federal level. Unlike the Red Cross, Seven Counties relies on 95% of its budget from government sources.

**(5)**

Turning to the fifth factor, the Supreme Court observed that "time and time again, both the President and the Congress have recognized and acted in reliance upon the Red Cross' status virtually as an arm of the Government." *Dep't of Emp.*, 385 U.S. at 359–60. For this factor, the Supreme Court cited historical references where the Red Cross provided government functions. For example, the Court noted President Taft's proclamation in 1911 that the Red Cross was to be, among other things, "the only volunteer society now authorized by this government to render aid to its land and naval forces in time of war." Proclamation of President Taft, 37 Stat. 1716 (Aug. 22, 1911). Likewise, the Commonwealth solely relies upon Seven Counties to administer its mental-health program to qualifying citizens in a seven-county area. *See, e.g.*, Ky. Rev. Stat. § 210.380. The Red Cross, even though corporate in form, was designated as the provider of "volunteer aid to the sick and wounded" going back to January 1905. Proclamation, 37 Stat. at 1716. Seven Counties shares striking similarities in this regard.

**(6)**

Finally, the Supreme Court recognized differences between the Red Cross and typical government agencies. Nevertheless, it wrote, "[i]n those respects in which the Red Cross differs from the usual government agency—e.g., in that its employees are not employees of the United States, and that government officials do not direct its everyday affairs—the Red Cross is like other institutions—e.g., national banks—whose status as tax-immune instrumentalities of the United States is beyond dispute." *Dep't of Emp.*, 385 U.S. at 360.

Much was made at oral argument about how Seven Counties' employees are not state employees and the Commonwealth does not control Seven Counties' day-to-day activities, and so Seven Counties cannot be an instrumentality of Kentucky. As *Department of Employment*

makes clear, these factors are not dispositive, at least in the constitutional context. The Supreme Court acknowledged the Red Cross's distinct status "from the usual government agency"—and yet it found "the Red Cross is clearly . . . an instrumentality." *Dep't of Emp.*, 385 U.S. at 359–60.

The Red Cross is not an outlier. Amtrak, for example, is also an instrumentality of the United States for constitutional purposes. *See Lebron.*, 513 U.S. at 394. The Supreme Court, in an opinion by Justice Scalia, took a pragmatic and broad approach in concluding that Amtrak was an instrumentality. *Id*. at 392; *see also Clallam Cty., Washington v. United States*, 263 U.S. 341, 344 (1923) ("In short the Spruce Production Corporation was organized by the United States as an instrumentality . . . ."). Like Seven Counties, "Amtrak was created by a special statute, explicitly for the furtherance of . . . governmental goals." *Lebron*, 513 U.S. at 397. I do not mean to suggest that the Commonwealth "created" Seven Counties in its original corporate form. But the Commonwealth in a sense "recreated" Seven Counties as an instrumentality when it designated it as the mental-health program administrator for its area.

The court would hardly open Pandora's Box by holding Seven Counties is an "instrumentality" of Kentucky for purposes of the Bankruptcy Code. The Supreme Court—albeit in different contexts—has already held that entities such as the Red Cross and Amtrak *are* instrumentalities. And Seven Counties shares most of the features that made the Red Cross "*clearly* . . . an instrumentality" for constitutional purposes. *See Dep't of Emp.*, 385 U.S. at 359–60 (emphasis added).

Of course, the definition of "instrumentality" for Chapter 11 purposes under the Bankruptcy Code does not depend on the definition of "instrumentality" for tax-immunity purposes under the Constitution. *See Dep't of Emp.*, 385 U.S. at 358.[8] Therefore, although I find comparison of these factors to be a useful exercise, I do not propose that we use those constitutional factors to construct a test for a statutory definition.

---

[8]But neither does any other definition of instrumentality depend on a definition in the Bankruptcy Code. Even though Seven Counties is an "instrumentality" for Chapter 11 purposes because Congress defined it "in the broadest sense" to protect state sovereignty, Seven Counties may not necessarily be an instrumentality for other purposes, particularly where state sovereignty interests are not at their apex like here.

Yet I still wonder: If the Supreme Court has also told us entities like the Red Cross and Amtrak are instrumentalities for constitutional purposes, why would we reject the Supreme Court's mandated, ordinary-meaning approach to a mere statutory definition? *See, e.g.*, *Ky. Emps. Ret. Sys. v. Seven Counties Servs., Inc.*, 550 B.R. at 758; *Las Vegas Monrail*, 429 B.R. at 789. Seven Counties does not explain why Congress defined "governmental unit," or "instrumentality," narrowly, let alone any narrower than the Supreme Court constitutionally conceptualized instrumentality. In fact, the definition of "instrumentality" is no different for federal instrumentalities than for state instrumentalities under the Bankruptcy Code. *See* 11 U.S.C. § 101(27), (40). If the Supreme Court uses a broad construction of instrumentality to honor federal supremacy, surely we should use at least as broad of a construction to respect state sovereignty in the bankruptcy context, where Congress has evinced its intent to define the term "in the broadest sense."

*****

The very objection that allegedly warrants a muscular "state control" test—one that would almost certainly exclude many municipalities—is built upon a house of cards. *See Las Vegas Monorail*, 529 B.R. at 789. I admit that some degree of state control is necessary. Indeed, an ordinary-meaning approach, which is mandated by the Supreme Court, accounts for it. *See supra* Part I.B.3. But the strange "state control" test that the majority adopts today goes beyond ordinary meaning and tramples on state sovereignty.

Because the majority uses the wrong approach and reaches the wrong result, I respectfully dissent.